607 F.Supp. 196 (1984)
Robert A. EARDMAN, Carroll G. Heck, Wesley H. Prine, Richard D. Womer, William Diehl, Odelon W. Fecteau, Barbara McGeever, Frank A. Randazzo, On Behalf of Themselves and as Representatives of a Class of Persons Similarly Situated, Plaintiffs,
v.
BETHLEHEM STEEL CORPORATION EMPLOYEE WELFARE BENEFIT PLANS, D.W. Kempken, Secretary of the Insurance Board, John Doe Corporation, Defendants.
No. CIV-84-274E.
United States District Court, W.D. New York.
September 17, 1984.
Memorandum And Order Approving Settlement April 30, 1985.
*197 Richard E. Moot, Buffalo, N.Y., for plaintiffs.
David K. Floyd, Buffalo, N.Y., for defendants.

*198 MEMORANDUM and ORDER
ELFVIN, District Judge.
In this action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., alleging inter alia a violation of the terms of an employee welfare benefit plan,[1] a hearing for the presentation of evidence pertinent to the construction of certain provisions of such plan's documents upon which plaintiffs' first cause of action is premised was held July 18th through 26th.[2] In an Order filed June 22, 1984 I had denied both parties' motions for partial summary judgment concerning plaintiffs' initial claim inasmuch as it was found that the plan's "amendment or termination" provisions were not so unambiguous as to warrant such drastic procedural remedy. The evidentiary hearing was directed in order to permit the parties to present extrinsic evidence with respect to the interpretation of any plan documents relevant to the disputed authority of defendants to alter or cancel the health benefits in issue.
Many of the background facts pertinent to plaintiffs' first cause of action are not disputed. On December 8, 1976 the Board of Directors of Bethlehem Steel Corporation (hereinafter "Bethlehem") adopted the Social Insurance Plan of Bethlehem Steel Corporation and Subsidiary Companies, as Amended Effective as of December 1, 1976 ("the Plan") (Plaintiffs' exhibit 37).[3] Such plan is an employee welfare benefit plan as defined under ERISA, 29 U.S.C. § 1002(1),[4] authorizing the establishment of medical, life insurance and similar benefits programs for eligible employees and pensioners. Pursuant to the Plan and its earlier versions numerous benefits programs had been instituted by Bethlehem over the years for active union and non-represented employees as well as for pensioners.
On or about March 6, 1984 Bethlehem caused to be mailed to members of the plaintiff class a communication notifying them that changes in their medical care coverage under benefits programs established pursuant to the Plan would become effective April 1, 1984. Among the major changes were the institution of premiums to be paid by participants, deductibles prior to the reimbursement for hospital and physicians' services, precertification requirements for certain types of inpatient care, and lifetime limitations on company-paid benefits for each participant and dependent (Plaintiffs' exhibit 12).
The sole question before the Court at this juncture is whether under the terms of the Plan documents Bethlehem had reserved the right to reduce the terms of pensioner health care programs' coverage and to require the payment of contributions by participants in these programs.
*199 Plaintiffs have consistently asserted that, according to the terms of the Plan documents and specifically Section 2 of Article XI thereof, Bethlehem was precluded from terminating or reducing the terms of coverage of any benefits program of a class member once he or she had retired with a sufficient number of years of continuous service or had otherwise become eligible for participation under the specific provisions of a benefits program.
Bethlehem has contended that, pursuant to the amendment and termination provisions contained in Article XI of the Plan it has always retained the right to amend or terminate the Plan or any benefits program thereunder, provided that a participant was fully reimbursed with respect to a claim incurred or "in the pipeline" prior to the effective date of amendment or termination of coverage.
Twelve witnesses testified during the course of the evidentiary hearing.[5] Jere Y. Heisler, who had worked for Bethlehem for thirty-six years prior to his July 31, 1983 retirement from the position of Manager of Production Scheduling at the Bethlehem, Pa. plant, testified regarding an April 1980 meeting of the top management personnel of the corporation at the Boca Raton Hotel in Florida. Heisler testified that on the final day of such meeting Bethlehem's outgoing Chief Executive Officer Lewis W. Foy had given some general farewell remarks and that each member of the Bethlehem Management Group was then presented with a personalized looseleaf book entitled "Your Financial Security." Heisler recalled that Ben Boyleston of the Employee Benefits, Human Resources Office had given a presentation in which he outlined the contents of the book for the group and had explained the benefits that "Management Group" members would receive as active employees and later as retirees. Heisler noted at the hearing that page 3 of the Medical Benefits section contained the statement, "Following your retirement, you and your dependents will continue to receive Blue Cross and Blue Shield coverages at no cost to you." (Plaintiffs' exhibit 4). Heisler testified that the book did not mention any right of Bethlehem to cancel benefits although it was explained therein that specific benefitsnamely, vision, dental care and annual physical examinations would terminate upon retirement.
Heisler further pointed out that page 2 of the life insurance section of the so-called "Boca book" contained the following representation: "After your retirement, the cost of your life insurance will continue to be paid in full by Bethlehem." The book further explained that reductions in the amount of life insurance coverage would occur when the retiree had reached certain ages but that, at the end of these periods, "the amount of your insurance under each policy will be 50% of that in effect immediately prior to your retirement and will then remain unchanged until your death."
Heisler additionally testified that he had considered these benefits when he had opted for early retirement in 1983 and that he had also cancelled his own life insurance coverage due to his understanding that Bethlehem had undertaken to continue his company-paid life insurance indefinitely after his retirement.
Subsequent to his decision to take early retirement, Heisler had received an "exit interview" from Bethlehem employee Joanne Refscher during which his pension, accrued vacation, life insurance and medical benefits had been explained to him.[6] Heisler testified that he had been advised during the interview that Bethlehem would continue to pay for his life insurance, that his medical benefits would remain in the same posture and that, should his spouse *200 survive him, she would continue to receive medical benefits.
Heisler additionally testified that in 1980 the Bethlehem Management Group consisted of approximately 250 members, that such individuals had received special benefits as opposed to other non-union employees and that he believed Bethlehem had retained the right to change benefits of active employees.
William E. Diehl, who had worked for Bethlehem for thirty-two years and had retired June 30, 1981 from the position of Manager of Sales for the Reinforcing Bars Fabrication Division of Bethlehem, testified regarding information he had received prior to retiring with respect to benefits. He stated that he had received inter-office correspondence from Tom Mohr, Assistant Vice President for Sales Personnel, which provided information regarding, inter alia, life insurance and Blue Cross/Blue Shield coverage following retirement. This document (Plaintiffs' exhibit 16) stated in part that Diehl's two life insurance policies would continue after retirement with certain yearly reductions when he would reach sixty-five and seventy years of age. The "last reduction" was to occur at age sixty-nine under one policy and at age seventy-four under the other, with the coverage to then remain at 50% of the amount respectively in effect at the date of retirement. The correspondence also indicated that Blue Cross/Blue Shield and Major Medical coverage would be company-paid for Diehl and his eligible dependents but that dental and vision care expense coverage would be discontinued at retirement.
Carroll G. Heck, a Bethlehem employee for thirty-one years who had retired July 31, 1980 from the position of Assistant General Manager of the Lackawanna (N.Y.) Plant, also testified regarding the Boca Raton meeting. He recalled that none of the speakers at the meeting wherein benefits had been discussed had said that Bethlehem could cancel or diminish any of the benefits after the retirement of an employee. Heck also testified regarding a July 8, 1980 letter he had received from David W. Kempken, Manager of the Employee Benefit Programs, which explained the "lump-sum" retirement option. The letter (Plaintiffs' exhibit 43) contained the statement:
"If you receive a lump-sum payment as opposed to a regular monthly Bethlehem pension, you will still be enrolled in both the Program of Hospital and Physicians' Services Benefits for Eligible Pensioners and Surviving Spouses (Blue Cross-Blue Shield) as well as in the Major Medical Expense Insurance Program for Retired Members of the Bethlehem Management Group and Their Eligible Dependents. Both of those Program coverages will be provided by Bethlehem at no cost to you. In addition, your Metropolitan and John Hancock life insurance coverages will be continued in the same manner as if you would be receiving a regular monthly Bethlehem pension."
Heck further testified regarding the circumstances leading to the institution of this action. He said that all of the pensioners with whom he has spoken believe that Bethlehem did not have the right to reduce their benefits. He further averred that he had interpreted the reference in the Boca book to possible future changes of benefits to have permitted reductions in benefits of active employees and only additions to benefits of pensioners.
C. Thomas Mitchell, who had worked for Bethlehem for approximately twenty-three years and had retired July 30, 1983 as Manager of Bethlehem's Field Printing Department testified with respect to an "exit interview" he had received June 30, 1983 after he had decided to retire. Mitchell recalled that at such interview he had asked Jacqueline Coyle, the Bethlehem representative, what would happen to his Blue Cross/Blue Shield coverage upon his reaching sixty-five years of age. Mitchell testified that Coyle had told him that those medical benefits would continue for his life.
Robert E. Cooper, who had worked for Bethlehem for over eighteen years as its Coordinator of Electrical Testing and Training and in its Pension Office from *201 August 1981 until his retirement July 31, 1983, testified regarding the procedures he had utilized in giving exit interviews to non-unionized employees. Cooper stated there had been a packet of forms which had to be explained to and be signed by the employee and that a booklet explaining benefits also had been given to the employee. Cooper testified that he had given at least two hundred of such interviews and that he had always told the employee that he or she would receive Blue Cross/Blue Shield coverage for life, life insurance coverage for life with certain yearly reductions upon reaching age sixty-five and that dental and vision care coverage would end upon retirement. Cooper stated that he had not received any formal training from Bethlehem as to conducting exit interviews but that he had observed interviews conducted by Emmet Moyer, Coordinator of the Pension Office, and Tom Lohr and Judy North of such office for approximately two weeks when he had first started working in the Pension Office. Cooper recalled that during the course of interviews these interviewers had told retiring workers that they would have free Blue Cross/Blue Shield coverage for the rest of their lives. Cooper also recalled that, when Moyer had advised retirees regarding eligibility for Blue Cross/Blue Shield coverage and the provisions with respect to a retiree's surviving spouse's coverage, it had been explained that such provisions meant that the retiree would receive such for all of his or her life. Cooper further testified that he had never been instructed to advise retirees that downward changes in their benefits could occur after the date of retirement.
George W. Lutz, who had retired July 31, 1983 after twenty-five years as Bethlehem's Supervisor of Salary Administration, also testified regarding the administration of exit interviews. Lutz had worked under William Churn in 1976 and for two years had observed numerous exit interviews conducted by Churn. From 1978 to January 1983 Lutz himself gave exit interviews to non-union employees. He testified that a copy of a booklet entitled "Program of Hospital, Physicians' Services and Major Medical Benefits for Eligible Exempt Salaried Pensioners and Surviving Spouses of Bethlehem Steel Corporation and Subsidiary Companies, effective January 1, 1981" (Plaintiffs' exhibit 5) had been given and explained by him to salaried employees at the interviews.[7] Lutz had informed such employees, among other things, that their health benefits would continue to the age of sixty-five with certain changes occurring upon their eligibility for Medicare and that their life insurance coverage would continue following retirement with designated reductions upon their reaching certain ages. He had never told these retirees of a possible diminishment of life insurance or health benefits and he testified that the documents which had been provided to retirees did not warn of such.
Lutz further testified that a different booklet, entitled "Program of Hospital and Physicians' Services Benefits for Eligible Pensioners, effective August 1, 1975" (Defendants' exhibit 35), had probably been utilized prior to August 1, 1979 until Plaintiffs' exhibit 44, similarly titled yet effective August 1, 1979, had become the pertinent booklet. Lutz recalled that prior to August 1979 retirees had been told that their health coverage would cease at age sixty-five (when they would become eligible for Medicare) and that subsequent to August 1, 1979 retirees had been instructed to enroll for Parts A and B of Medicare upon reaching sixty-five inasmuch as the company-paid benefits were merely supplemental to Medicare benefits after such age. He had examined Plaintiffs' exhibits 5 and 44 and had found no provisions therein with respect to Bethlehem's right to change or terminate the benefits programs described therein.
John Clyde Overdurf, Jr., who retired April 1, 1978 from the position of Assistant Supervisor of Bethlehem's Wire Mill, Williamsport *202 (Pa.) Plant, testified regarding pension and health benefits information imparted to him prior and subsequent to his retirement. Overdurf recalled being told that the company would pay for his and his wife's medical coverage until he reached sixty-five, that his widow would remain covered and that his life insurance coverage would continue to sixty-five when certain yearly reductions would commence until he became seventy-one. He had received a benefits booklet in the mail in the early part of 1981 and, when he had inquired regarding such, had been told by an employee of Bethlehem that coverage under such program was automatic for him and his spouse and that he therefore did not need to take any action at that point. Overdurf also recalled receiving a number of benefits booklets over the years and further testified that he had never been told that Bethlehem could reduce or terminate his benefits after his retirement.
Kempken, presently Bethlehem's Division Comptroller, Capital Budgeting, Planning and Analysis, had been the Manager of Employee Benefits in Bethlehem's Human Resources Department prior to June 1, 1984. He had also acted as Secretary of the Insurance Board created by the Social Insurance Plan and as the Plan's Administrator from January 1, 1979 until May 31, 1984. During the hearing Kempken acknowledged that ERISA had imposed certain administrative and fiduciary duties upon him in his capacity as Plan Administrator. He also testified that as Manager of Employee Benefits in 1983 he was a primary actor in the design of the new Comprehensive Medical Program ("CMP"), the implementation of which is this litigation's raison d'être.
Kempken had been a member of a company task force created in the Spring of 1983 to study health care costs containment. The task force had submitted a report to John A. Jordan, Jr., Vice President of Planning and Human Resources, in December 1983 and as a result of the study certain reductions in the benefits coverage of active employees had been instituted January 1, 1983 and during 1983.
Kempken testified that it was his interpretation of the Plan, and specifically of Article XI, Section 2 thereof, that Bethlehem had reserved the right to alter or even to terminate medical or life insurance coverage of both active and retired employees. He construed the "proviso" language of Section 2 merely as precluding a procedure whereby termination of benefits would adversely affect pretermination incurred expenses, such as expenses stemming from a period of hospitalization that had commenced prior to the date of the termination of coverage even though extending past such date. According to Kempken, the Plan's terminology was meant to insure reimbursement to an employee or retiree of such expenses if the hospitalization had begun prior to termination. However a re-admission to the hospital thereafter would not be covered by a program even if it were related to the prior illness inasmuch as such claim would not be considered as having been "incurred" prior to termination of coverage.
Kempken stated that he believed that Bethlehem had complied with ERISA with respect to the Plan and the statute's requirement of a summary plan description ("SPD") of any plan. However he confessed that there was some uncertainty regarding certain programs' SPDs' denial and termination provisions. He stated that ten years after the enactment of ERISA the Department of Labor had finally concluded that a plan's possible termination was a circumstance which had to be included in a SPD.[8]
Kempken further testified that the notification of the possibility of the amendability or cancelability contained in Defendants' *203 exhibit 35 had been inadvertently omitted from the 1979 and 1981 SPDs for retiree benefits programs but that such would be contained in all future SPDs.
With respect to the Plan itself, Kempken testified that such document did not actually describe eligibility requirements for participation in a hospital or physicians' services benefits program. The Plan did however define the Plan Administrator's duties. He stated that the Plan had been adopted in 1950 and had been amended in 1951 and again December 1, 1976, that the CMP does not alter the Plan but is merely a benefits program under it and that the term "employee" as defined in Article I of the Plan includes both active and retired workers.
Kempken testified that Bethlehem first provided company-paid health benefits for exempt salaried pensioners in 1966 under a program which allowed an individual to receive more extensive coverage by paying a monthly premium. (Defendants' exhibit 31). Thereafter, other programs were instituted for pensioners not eligible for Medicare and later also including Medicare-eligible pensioners with an exclusion of coverage of certain services that would be paid for by Medicare. Kempken testified that in 1981 an optional Major Medical program was introduced for non-exempt salaried pensioners with the entire cost therefor paid by program participants. He also stated that in 1983 the programs for both active employees and pensioners were administratively altered to screen more tightly the services paid for or to eliminate services that were no longer state-mandated.
He further testified that it had been intended that the SPDs, Plaintiffs' exhibits 5 and 44, would be relied upon by retirees, yet he acknowledged that the language regarding possible termination of medical benefits contained in the prior SPD, Defendants' exhibit 35, had been inadvertently omitted from such. He had become aware of such omission prior to 1983.
Additionally Kempken asserted that Plaintiffs' exhibit 44, which was effective August 1, 1979, had been the first post-ERISA booklet for retirees, that retirees had received no advice that their benefits were terminable other than information set forth in the SPDs and in life insurance certificates and that the group insurance certificate had clearly indicated that such was terminable. He conceded that, from the language contained in Plaintiffs' exhibit 16 (the March 16, 1981 memorandum from T.H. Mohr to William Diehl stating "last reduction" in life insurance coverage "at age 69"), an average Plan participant could infer that such benefits were not terminable.
In further explaining his interpretation of the disputed "provided, however" language of the Plan, Kempken explained that the Plan had been administered on the basis that the costs of incurred covered services would be paid despite termination of a program. For example, a life insurance beneficiary would be entitled to payment if the insured's death had occurred while coverage was in place and, if death had occurred within a specified time after termination, it would be assumed that the individual would have opted to have converted the policy to an individual policy with premiums paid at his or her own expense. Kempken asserted that the concept of entitlement to benefits under a program, as set forth in the disputed clause, required an admission to a hospital or the receipt of a service before a "benefit" was deemed to have arisen under such program.
John C. Dakes, who had worked for Bethlehem from 1951 until his retirement December 12, 1982 from the position of Industrial Relations Coordinator for Steel Operations, testified with respect to "plant shutdown presentations" that were given to large groups of employees during 1975 and 1976 prior to the closings of particular plants. He testified that he and Dick Kyte, from the Corporate Personnel Department, would conduct such presentations in plant auditoriums as soon as possible after the announcement of the anticipated shutdown in order to relieve tensions and to assure the workers that certain benefits would be *204 made available to them. Dakes indicated that he had given approximately 150 such presentations to over 19,000 employees, including approximately 6,000 non-represented employees. A different presentation would have been given depending upon the type of group of employees  i.e., salaried exempt, non-exempt or union-represented  attending the meeting.
Dakes stated that at the presentations broad factual representations would have been made, yet the benefits booklets had been referred to and the employees had been told that the specific terms of the booklets were controlling if there was a conflict between such and the oral presentation. Pension and alternative employment options had also been discussed. Life insurance and medical benefits eligibility for workers entitled to a pension after retirement had been explained although the employees had never been told by Dakes that such could be cancelled prior to death.
Frank S. Dickerson, Treasurer of Bethlehem since July 1, 1983 and with the company's Law Department since 1973, testified regarding his involvement in the preparation of the 1976 amendments to and alterations of the Plan to conform with the enactment of ERISA. He recalled that the "provided, however" language had appeared in Article II, Section 2 of the 1951 version of the Plan and that he had proposed adding such language to Article IV, Section 3 and to Article XI, Section 2 of the 1976 "ERISArized" version of the Plan in order to preclude the Plan Administrator from not honoring a claim for services rendered to a participant by a doctor or hospital prior to the date of termination of coverage. He opined that such language had been utilized in Article II, Section 2 of the 1951 Plan to ensure that, if a subsidiary company had withdrawn its participation in the Plan, incurred benefits of an employee would not be adversely affected.
Dickerson also testified regarding the process of circulating the revised drafts of the 1976 version of the Plan for the comments and suggestions of other Bethlehem personnel. He also agreed, that due to certain language contained in the Boca book, a plan participant might assume that health care coverage was to be provided at no charge for life.
Alexander D. Stevenson, who had retired June 30, 1982 as Assistant Manager of Bethlehem's Employee Benefits Program, testified with respect to the process of preparing benefit booklets for employees and pensioners. He stated that he and his staff would have examined the benefits that had been negotiated for represented employees and would then have revised the non-union booklets so as to provide non-represented employees with benefits as good as, and often better than, those that had been agreed upon for union members.
Stevenson further testified that certain booklets had contained language indicating that Bethlehem could cancel benefits coverage while others had not. He asserted that he had first discovered the omission of such language from a booklet during his attendance at a retirees' meeting following his own retirement. A retiree had raised the question of cancellation of benefits and Stevenson recalled that upon looking in his benefits booklet he had been surprised to find that the termination language was not present. Stevenson asserted that it had not been Bethlehem's intention to omit the termination language and that the provision had been inadvertently deleted when new union booklets, and therefore new non-union booklets, had been prepared sometime after 1975.
Stevenson further testified that the Boca books were not handed out at the Florida meeting but had been received by the individuals shortly thereafter, that the Management Group's group life insurance certificates and informational letters regarding such had explicitly reserved Bethlehem's right to terminate the policies in the future and that Bethlehem had always intended to retain the right to modify or terminate life insurance and other benefits. Stevenson is not an attorney and, although he had put together the SPDs by examining the union contracts and formulating equal or better benefit packages for the *205 non-represented employees, he testified that the compliance of such booklets with the requirements of ERISA was within the province of Ben Shaner at first and then Kempken, who had replaced Shaner as Manager of Employee Benefits in 1979. Stevenson stated that the drafts of the booklets went to Kempken, whose department would review them.
Stevenson was questioned regarding Plaintiffs' exhibit 61, a booklet entitled "Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem * * * Pursuant to Agreement with United Steelworkers of America, Effective January 1, 1981." Such booklet is essentially identical to Defendants' exhibit 37 except that it contains the actual agreement between Bethlehem and the union in its pages 47 through 50. Provision 6 on page 49 provides:
"Continuation of Coverage

"Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program)[9] so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise."
Stevenson rejected plaintiffs' counsel's suggestion that this provision had been the basis for the deletion of the termination language from non-union employees' booklets.
John C. Hickey, a non-attorney member of Kwasha Lipton which is an employee benefits and compensation consulting firm, was called as an expert witness by defendants. He opined that Article XI, Section 2 of the Plan reserved the right of Bethlehem to change benefits programs subject only to not adversely affecting covered costs which already had been incurred  i.e., a prior death under a life insurance program or services received during a hospitalization already commenced under a health benefits plan. When asked by this Court whether the proviso language was perhaps redundant or merely stated the obvious, Hickey responded that it was a good drafting practice to include such language to express the "fair play" notion of honoring incurred claims despite a program's termination. He also indicated that he did not know of any legal obligation of an uninsured benefit plan to pay for incurred services after plan termination. He further stated that the specific termination of coverage provisions contained in Plaintiffs' exhibit 5 did not affect his opinion regarding Bethlehem's right to terminate a program.
The May 29, 1984 affidavits of two class members, Gerald P. Breen and Jerry E. Nowland, were received in evidence in lieu of their live testimony. Each affidavit indicates that during an exit interview the affiant had received a one-page worksheet (Exhibit A to each's affidavit) indicating that as a retiree he would receive "Free Blue Cross-Blue Shield in Pension Group (continues also when you have Medicare)" and that his life insurance would continue after retirement with certain reductions at age sixty-five until a "final amount" was reached when he became seventy-one.
Plaintiffs have alleged in their first cause of action that the adoption of the CMP, resulting in a diminution of their health care benefits, violated the provisions of the Plan documents which had fixed the terms of eligibility, terminability and the scope of health care and life insurance benefits for a retiree as of the date of his or her retirement.[10] Plaintiffs had argued *206 throughout the course of the hearing and in support of such assertion that the various program booklets received in evidence should be considered Plan documents, pertinent to the construction of the "provided, however" language of Article XI, Section 2 of the Plan. Defendants never seriously controverted plaintiffs' position with respect to this issue yet have consistently contended that the Plan was the controlling Plan document, that it was not necessary to consider the program booklets in order to resolve the question of Bethlehem's right to terminate benefits under the Plan and that the booklets' provisions were consistent with defendants' construction of the Plan in any event.
In response to a July 31, 1984 post-hearing letter from this Court to the parties' counsel regarding this issue, defendants' attorney reiterated in writing the above-stated position and provided an affidavit from Kempken dated August 3, 1984 wherein it was explained at paragraph 5:
"Prior to the inauguration of the Comprehensive Medical Program for active and retired employees in 1984, there were no program or plan documents that described the particular benefits program other than the various booklets identified at trial. Thus, since ERISA, the benefits program booklet and the `summary plan description' required by ERISA were the same document. Other than announcements of changes in a benefit program that were distributed between booklet printings, and an occasional pamphlet for special situations like the `Boca book', there were no other documents describing these benefit programs."
Bethlehem therefore had utilized a procedure whereby the SPD and the actual benefits program were contained in one document. No SPD had ever been prepared or distributed concerning solely the Plan, the "controlling Plan document," and retirees had received the combination SPD/program booklets which made reference to the Plan in somewhat uncertain terms. For example the "Foreward" to Defendants' exhibit 37, "Program of Hospital-Medical Benefits for Eligible Pensioners * * * Effective January 1, 1981," stated in part as follows:
"This booklet is the summary plan description required by * * * [ERISA] of the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses.
* * * * * *
"The hospital and physicians' services benefits of this Program which are paid for entirely by the Company, are provided in accordance with agreements entered into by the Insurance Board under the Social Insurance Plan * * * on behalf of the Company with Blue Cross and Blue Shield. * * *
* * * * * *
"The name of the plan under which the benefits described in this booklet are provided is the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses (`Plan').
* * * * * *
"Benefits under the Plan are provided through the Social Insurance Plan of Bethlehem * * *." Defendants' exhibit 37 at 1-2.[11]
Presumably, had a retiree exercised the right described on page 3 of the booklet to examine without charge "all documents relating to the Plan (including the Plan, the Social Insurance Plan Trust Agreement," and the other documentation listed therein), he or she would have had access to the Plan containing Article XI, Section 2's ambiguously worded provision regarding amendability or terminability of benefits. *207 However the relevant pensioner programs booklets themselves contained specific eligibility and termination of coverage provisions which set forth no reservation or right by Bethlehem to alter or cancel such programs. Defendants' exhibit 37 contained the following provisions:
"Section 4. General Provisions
"Eligibility

4.0 You will be eligible to participate in the Program if you
(a) retired prior to or retire on or after July 31, 1980, under the Company pension plan, on other than a deferred vested pension, from a group of employees designated by the Company as covered by the Program and at the time of retirement have 15 or more years of continuous service, or
(b) are receiving a Surviving Spouse's benefit under the Company pension plan as the surviving spouse of an employee
(1) who retired prior to or retires on or after July 31, 1980, under the Company pension plan, on other than a deferred vested pension, from a group of employees designated by the Company as covered by the Program, and dies thereafter, or
(2) who died prior to or who dies on or after July 31, 1980, at a time when the employee was or is accruing continuous service in a group of employees designated by the Company as covered by the Program;
provided, however, that you
(i) are not insured under any other group insurance plan or program providing hospital and medical coverage, including a prepaid group practice plan or Health Maintenance Organization, toward the cost of which the Company contributes; and
(ii) are a resident of the United States or Puerto Rico."
* * * * * *
"Termination of Hospital and Physicians' Services Coverage

4.25 Hospital and physicians' services benefits coverage of a pensioner and of an individual receiving a Surviving Spouse's benefit under the Company pension plan terminates on the earliest of:
(a) the day on which such person ceases to be eligible for coverage under the Program;
(b) the end of the month in which notice from such person is received by the Plan Administrator (see paragraph 4.15) requesting termination of coverage under the Program; or
(c) the day immediately preceding the date on which an individual receiving a Surviving Spouse's benefit under the Company pension plan remarries."[12]
In view of the assertions by Kempken that the booklets were the documents containing the programs and Article VII, Section 1 of the Plan (wherein it is stated that the rights of a participant in a benefits program shall be "as provided in any other writing relating to such program that shall describe the rights") as well as the fact that an employee benefit plan under ERISA can be comprised of more than one document (see, e.g., Myron v. Trust Co. Bank Long Term Dis. Ben. Plan, 522 F.Supp. 511, 519 (N.D.Ga.1981), aff'd, 691 F.2d 510 (11th Cir.1982), cert. denied, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983)), I find that the booklets describing the pensioner benefits programs are Plan documents. As such, they are entitled to be and have been given consideration with respect to the question of the retention vel non by Bethlehem of the right to reduce or cancel the benefits programs in question under the provisions of the Plan and these booklets.[13]
*208 The principally disputed provision of the Plan, Article XI, Section 2, provides:
"AMENDMENT OR TERMINATION
* * * * * *
SECTION 2. Of Any Benefits Program. Whenever authorized so to do by the Board of Directors of the Corporation, the Insurance Board shall have the right to amend or terminate any benefits program hereunder, effective as of the expiration of the policy or policies of group insurance whereby such program shall have been effectuated or effective as of the earlier termination by the Insurance Board of such policy or policies; provided, however, that the Insurance Board shall not terminate any such policy or policies if such termination would deprive any participant in a benefits program hereunder, his dependents or beneficiaries of any benefits to which any of them shall theretofore have become entitled under such program." Numerous other provisions contained in Plan documents and in other exhibits received in evidence have been reviewed and considered in interpreting the meaning of the above section. Article I, Section 1(a) of the Plan defines the term "benefits program;" Section 1(c) defines the term "employee" to include a person who has retired from Bethlehem and is eligible to receive a pension; Section 1(j) defines "social insurance benefits;"[14] Article II, Section 2 contains "provided, however" language with respect to a Subsidiary Company's revocation of its participation in the Plan;[15] Article IV, Section 1 authorizes the establishment of benefit programs under the Plan by Bethlehem's Board of Directors; Article IV, Section 3 provides for the merger of benefits programs and contains proviso language similar to that presently disputed;[16] Article VII, Section 1 states that the rights and obligations of a program participant shall be as provided in the insurance policy or any other writing relating to such program which describes such rights and obligations;[17] and Article XI, Section 1 states:

*209 "Article XI
"AMENDMENT OR TERMINATION
"SECTION 1. Of the Plan. The Board of Directors of the Corporation shall have the right to amend or terminate this Plan at any time; provided, however, that said Board shall not adopt any amendment to this Plan which shall deprive any participant in a benefits program hereunder, his dependants or beneficiaries of any benefits to which any of them shall theretofore have become entitled under such program; and provided further that, in the event of the termination of this Plan, each benefits program hereunder shall continue in effect until the expiration of the policy or policies of group insurance whereby such program shall have been effectuated or until the earlier termination by the Insurance Board of such policy or policies."
The actual eligibility and termination of coverage provisions of the various pensioner and active employee benefit program booklets received in evidence have also been scrutinized.
Plaintiffs have essentially argued that the proviso language of Article XI, Section 2 of the Plan should be read, "provided, however, that the Board may not terminate a program or reduce the terms of its coverage if such action would deprive a participant in the program of any coverage to which he or she had become entitled for life by reason of satisfaction of the eligibility requirements of such program." Defendants would construe the same clause to read, "provided, however, that the Insurance Board may terminate any program so long as any participant in a benefits program is reimbursed for any covered expense which he or she has already incurred under such program."
Although plaintiffs' construction of this inadequately worded clause is the more plausible one, the extrinsic evidence presented during the hearing disclosed that such terminology had actually been ignored for all intents and purposes by Bethlehem and that the terminability vel non of a specific benefits program depended rather on the provisions as set forth and explained in the program's booklet. This practice was consistent with Article VII, Section 1 of the Plan which stated that the rights and obligations of a participant would be as provided in the insurance policy and in any other writing relating to the program and describing the rights of a participant.
Accordingly, I have found upon inspection of the Plan documents and the extrinsic testimony and documentation relevant to such that Bethlehem had not retained the right to reduce or to terminate the medical or life insurance benefits programs in effect for eligible pensioners prior to the adoption of the CMP. Acceptance of Bethlehem's position would require this Court to ignore the representations made by Bethlehem's own agents to retirees at exit interviews concerning the scope of their benefits and the meaning of the booklets, the representations made during the course of plant shut-down lectures explaining the pensioners' health and life insurance benefits programs, Bethlehem's policy of providing equal or better benefits for non-union employees, the provisions of the Boca book and other documents describing pensioners' health and life insurance benefits, the significance of the earlier booklets' explicit reservation of a right to terminate benefits, as well as the specific termination provisions in the booklets effective August 1, 1979 and January 1, 1981. In addition, defendants' contention that they had always intended to retain the right to cancel or reduce benefits under Article XI, Section 2 would require a finding (in view of the undisputed testimony in this action regarding the representations made to thousands of employees over the years with the full knowledge of top Bethlehem officers as to free Blue Cross and Blue Shield and *210 "locked-in" life insurance coverage) that an enormous fraud had been perpetrated upon plaintiffs by Bethlehem. Finally, I find that the "provided, however" language is susceptible of more than one reasonable construction and that defendants cannot be permitted to capitalize on their less than explicit draftsmanship and alleged secret intentions (although I find that such did not actually exist) with respect to the cancellation of benefits provisions of the Plan.
An in-depth examination of the testimony and documentation received in evidence at the hearing has led to the conclusion that the provisions of a specific benefits program were actually intended to govern the terminability or non-terminability of such program and that Bethlehem had not retained the right to unilaterally reduce or cancel health care or life insurance benefits of its retirees.[18]
Bethlehem's Employee Benefits Programs Division had demonstrated over the years an ability in drafting program booklets to indicate clearly and to warn explicitly that a particular program was subject to modification or termination, if such in fact was. Defendants' exhibit 31, a program entitled "Major Medical Expense Insurance for Eligible Pensioners and Their Dependents" effective July 1, 1966, provided free limited medical coverage for eligible retirees with optional premiums for more extensive coverage and contained an explicit reservation of Bethlehem's right to terminate or change such program. At page 11 therein, the last sentence of the booklet provided: "It is hoped that the Program will be continued indefinitely throughout the years, but Bethlehem Steel Corporation reserves the right to terminate or change the Program in the future." Such language also appears at page 11 of the August 1, 1975 version of the program, Defendants' exhibit 32, and, notably, at page 11 of the January 1, 1977 post-ERISA version of the program, Defendants' exhibit 33.
The booklets describing the "Program of Hospital and Medical Benefits Supplementing Medicare Provided by Blue Cross and Blue Shield for Eligible Pensioners" of Bethlehem, Defendants' exhibits 40 through 47, (July 1, 1966 through August 1, 1979) all contain specific language stating "Blue Cross and Blue Shield reserve the right upon 120 days' prior notice to terminate or change the provisions of the Program."[19]
The numerous booklets regarding life insurance and medical benefits of active non-represented employees in some instances contained specific language regarding possible termination or alteration of benefits and in instances omitted such. Defendants' exhibits 13, 14, 15, 17, 19, 22, 24 and 39 from January 1, 1960 to August 1, 1975 contained the clear warning that "[t]he Program may be changed or terminated in the future." No such phraseology appeared in Defendants' exhibits 20, 21, 23, 25, 26, 27 or 28 spanning the period from January 1, 1971 to January 1, 1981. However the parties' attorneys had agreed during the hearing that Bethlehem had always retained the right to alter the benefits received of active employees (such persons being free to seek alternative employment *211 if dissatisfied with the type or amount of benefits received) and therefore the pattern evidenced by such booklets is of minimal importance to the instant question.[20]
Defendants' exhibit 30, "Program of Insurance Benefits for Eligible Non-Exempt Salaried Employees * * * Effective January 1, 1983," contained the following disclaimer:
"Amendment or Termination of Plan or Program

"9.41 This Summary Plan Description is not an employment contract or an offer to enter into an employment contract, nor does it constitute an agreement by the Company to continue to maintain the Plan or the benefits program described or referred to herein.
The Social Insurance Plan of Bethlehem Steel Corporation and Subsidiary Companies and any benefits program established thereunder, including the Plan and the benefits program referred to in paragraph 9.27, are subject to amendment or termination by the Company at any time. However, any amendment or termination of the Social Insurance Plan or any benefits program established thereunder shall not deprive any participant of any benefits to which any of them shall have become entitled under any affected benefits program prior to such amendment or termination."
Such provision is further evidence of Bethlehem's ability to have expressed its retention of the right to terminate a program when such was intended and the fact that the terminability of a specific program depended on the provisions contained and expressed in such program's booklet.[21]
Further evidence of this practice and intention is demonstrated by Plaintiffs' exhibit 61, the benefits program booklet for union-represented pensioners, effective January 1, 1981. Although such program was administered under the Plan and its benefits funded and provided pursuant to the Plan, Bethlehem clearly had intended that such program's specific provisions would govern terminability rather than Article XI, Section 2 of the Plan. Provision 6 on page 49 of the program booklet,[22] containing one aspect of the agreement between the union and Bethlehem, precluded any reduction or termination of benefits coverage of a retiree by Bethlehem without the union's consent for as long as an individual remained retired. Bethlehem's position  namely, that Article XI, Section 2 of the Plan is the sole provision governing the terminability of any benefits program under the Plan  is thus further undermined by this exhibit and by the fact that Bethlehem's construction of the "provided, however" clause is inconsistent with the company's inability to have freely terminated the benefits program set forth in this program booklet.
This program booklet, when considered in conjunction with the testimony concerning *212 the benefits program explanations given to prospective retirees, the Plan and non-Plan documentation received in evidence and the testimony of Stevenson regarding Bethlehem's policy of providing equal or superior benefits for non-represented personnel, was further persuasive evidence that the pensioners' programs booklets effective January 1, 1981 were intended to provide non-terminable lifetime health care benefits for these plaintiffs.
The testimony with respect to the inadvertent omission from post-1975 pensioners' booklets of the language reserving the right to modify or terminate certain programs was simply not credible in view of the careful review process employed by Bethlehem in the preparation of such programs and was inconsistent with the oral and documentary representations made to employees concerning their pension and other benefits at the time that they were considering retirement. The representations made to Heisler, Overdurf and others that their spouses would continue to receive medical benefits after their deaths were strongly suggestive that such benefits were not terminable at the whim of Bethlehem. Cf., Bower v. Bunker Hill Co., 725 F.2d 1221, 1224 (9th Cir.1984). The correspondence and worksheets received by Diehl, Breen and Nowland indicating that free Blue Cross and Blue Shield would be received and would continue when they later became eligible for Medicare, and that life insurance coverage would reach a "final amount" at a certain age were inconsistent with a hidden intention to have reserved the right to have been able to cancel all of such on the day following retirement.
Plaintiffs' exhibit 43, Kempken's letter to Heck assuring medical care "at no cost to you" and life insurance coverage "continued in the same manner as if you would be receiving a regular monthly Bethlehem pension," implied a non-terminable obligation and cannot reasonably be construed to have included the proviso "unless we decide to end such program the day after you retire." Defendants did not attempt to refute or question Mitchell's testimony that he had been told at his exit interview that his health benefits would last for his lifetime, or Cooper's testimony that he had explained to over two hundred prospective non-represented retirees that the benefits program contained in the booklet received at the interview provided free Blue Cross/Blue Shield coverage for life. Defendants failed to produce any evidence controverting Cooper's assertions that he had observed and heard the Coordinator of the Pension Office making similar explanations of the benefits package to retirees. Lutz's testimony regarding his administration of exit interviews was additionally detrimental to defendants' contention that the Plan documents had reserved an unequivocal right to cancel the pensioners' programs.
The information imparted to thousands of prospective retirees by Dakes and Kyte was also consistent with an interpretation of the Plan documents finding an obligation under such to continue health and life insurance benefits for life. Plaintiffs' exhibit 32, a tape recording of a typical shutdown presentation by Kyte to exempt employees at Bethlehem's Lackawanna Plant, contains explanations of the benefits programs which indicated that "attached to a regular pension" is Blue Cross/Blue Shield "paid for by the company" until one is under Medicare and then in addition to Medicare. The employees were assured that they would be covered "for the whole time." With respect to life insurance coverage, Kyte explained the yearly reductions at designated ages and that thereafter one would "lock-in" at thirty percent of the coverage that had existed at the date of retirement. In explaining the benefits Dakes and Kyte had warned of the controlling nature of the booklets, yet such contained no contradictory provisions or reservation of a right to terminate the benefits programs that had been outlined as continuing for life by the two presenters. Rather, as previously noted, the pertinent booklets received in evidence, Defendants' exhibit 37 and Plaintiffs' exhibits 5 and 44, set forth specific termination scenarios, inconsistent *213 with an additional and undisclosed possibility of termination or detrimental amendment due to Bethlehem's subsequent reassessment of its health-care costs.
The Boca book, Plaintiffs' exhibit 4, although not a Plan document, was a carefully prepared description of the medical, life insurance and other benefits for Management Group members and contained numerous representations inconsistent with Bethlehem's assertedly reserved right to have terminated benefits programs of retirees at any time. The introduction to the book explained that certain special therein-described benefits which applied only to the Management Group members would appear in italics. It was further stated that although the information in the book was accurate, "in the event of inconsistencies between it and the provisions of the benefit or other plans, the provisions of the plans will, of course, govern." The "Physicians' Services Benefits" portion of the book stated in non-italicized print: "[F]ollowing your retirement, you and your dependents will continue to receive Blue Cross and Blue Shield coverages at no cost to you." The "Life Insurance" section of the book indicated: "After your retirement, the cost of your life insurance will continue to be paid in full by Bethlehem." Certain yearly reductions in coverage were to occur at age 65 under one policy and at age 74 under another yet, "[a]t the end of each of these five-year periods, the amount of your insurance under each policy will be 50% of that in effect immediately prior to your retirement and will then remain unchanged until your death." (Emphasis added). The "Surviving Spouse Information" section contained representations indicating that costs of benefits for pensioners' surviving spouses would "be borne entirely by the Corporation," a further indication of an understanding by Bethlehem that the programs created non-forfeitable or non-terminable protection for the life of the pensioner and his or her surviving spouse.
Plaintiffs' exhibit 23, a form entitled "Your Personal Statement of Benefits" included health care and life insurance benefits in the same section as the anticipated monthly pension check amount, thereby further representing that such benefits were to be received in an equally non-forfeitable or for-life manner.
Defendants have taken the position that, inasmuch as all of the benefit programs in issue were promulgated under the Social Insurance Plan, the language of the proviso of Section 2 of Article XI should be viewed solely in conjunction with Bethlehem's assertedly intended meaning as to such in order to resolve the instant controversy. Although the review of the totality of the evidence submitted in the course of the hearing has led to a rejection of such position and to the finding that Bethlehem had intended to and did in fact create non-terminable health care benefits programs due to the terms of such Plan documents, it is further noted that defendants' interpretation of the "provided, however," language and the evidence received in support of such construction would have been rejected in any event. Defendants' own documents had utilized the term "benefits" interchangeably with "coverage"  see, e.g., Plaintiffs' exhibit 12 at page 3 ("your current benefits will be replaced by essentially the same"), page 4 ("particular benefit or covered service remains a covered service under the CMP"), page 9 ("Many of the following changes represent an improvement in your benefits") and the Boca book at log 403654[23] ("The cost of these benefits will be borne by the Corporation"). Plaintiffs' construction of the proviso language, precluding termination of a program where such action would deprive a participant of coverage to which he or she had become entitled for life under the terms of such program, is the more reasonable.
Dickerson's testimony concerning the reason he had utilized such terminology in updating the Plan fails to convince this Court that Bethlehem's Board of Directors, or anyone else for that matter, at the time *214 of adoption of the 1976 version of the Social Insurance Plan would have imparted such meaning to the language employed therein. It is noted that, even if one were to assume that the language in Section 2 of Article II was intended to protect incurred claims, such section provided that a revocation of a prior adoption of the Plan by a Subsidiary Company "shall not so operate as to deprive" participants of (incurred) benefits under a program. However, Section 2 of Article XI did not state that termination of a program "shall not so operate as to deprive" participants of (incurred) benefits, but rather totally precluded the Insurance Board from terminating a program where such action would deprive a participant of coverage entitled to under a program. Had such clause merely been intended to have required the Plan Administrator to pay incurred claims upon the ending of a program (which would have essentially stated the obvious), such clause could have stated, similarly to Section 2 of Article II, that "termination would not so operate as to deprive" a participant of a benefits to which he theretofore was entitled, or could simply have directed the Plan Administrator to honor fully claims incurred prior to the date of termination of coverage.[24] The more believable testimony and the exhibits received regarding Bethlehem's and its agents' understanding and explanations of the Plan documents convincingly establish the non-terminable nature of plaintiffs' health benefits under programs in existence prior to the CMP.[25]
Defendants have further contended that the absence of specific language in the program booklets expressly creating a lifetime entitlement to health care benefits such as "vested" or "for life" or "non-forfeitable" demonstrated Bethlehem's intention to retain the right to terminate such benefits at its pleasure. However such argument is unacceptable in view of the substantially uncontroverted evidence of Bethlehem's agents' explanations of the nature of the benefits bestowed by the programs and the fact that such benefits were and are terminable upon the occurrence of specific events explicitly listed in the booklets  e.g., loss of eligibility due to no longer being a United States resident or the remarriage of a "surviving spouse." Furthermore, "retiree benefits are in a sense `status' benefits which, as such, carry with them an implication that they continue so long as the prerequisite status is maintained." Intern. U., United Auto., Aero., Etc. v. Yard-Man, 716 F.2d 1476, 1482 (6th Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Although such implication, in and of itself would be insufficient to support a finding of an intent to establish interminable benefits, the previously discussed extrinsic evidence of the meaning of the programs' terms and the context in which such benefits programs were usually explained  *215 namely, in the course of the presentation of prospective retirees' vested pension payment benefits  adequately and convincingly demonstrate the correctness of plaintiffs' interpretation of the meaning of the Plan documents.
For the reasons set forth above I find and declare that pursuant to 29 U.S.C. § 1132(a)(1)(B) plaintiffs are entitled as a matter of law to enforcement of their rights to non-terminable medical and life insurance benefits under the terms of the Plan documents in existence prior to the adoption of the CMP, except of course as such programs' booklets have specifically provided for termination  viz., the participant is no longer a resident of the United States or Puerto Rico or has requested termination of coverage or in the case of a surviving spouse has remarried (Plaintiffs' exhibit 5, and Defendants' exhibit 37).[26] Judgment is hereby ORDERED entered in plaintiffs' favor with respect to the initial cause of action contained in the Amended Complaint and, furthermore, consistent with the declaration herein of the rights of plaintiffs Bethlehem is directed to return any premiums paid by plaintiffs under the CMP and to apply the provisions of the prior existent programs retroactive to April 1, 1984, the date of the adoption of the CMP.

MEMORANDUM and ORDER APPROVING SETTLEMENT
In this class action lawsuit arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., an evidentiary hearing had been held before this Court July 18 through 26, 1984 and a Final Judgment was entered in plaintiffs' favor September 25, 1984 with respect to the first cause of action contained in their Amended Complaint.[1] Such judgment, consistent with this Court's September 17th Memorandum and Order that had found and declared that plaintiffs were entitled to enforcement of their rights to non-terminable medical insurance benefits under the terms of defendants' ("Bethlehem") Social Insurance Plan documents in existence prior to April 1, 1984, had directed Bethlehem to return any premiums paid by plaintiffs under the new Comprehensive Medical Program ("CMP") that had been adopted April 1st and to apply the provisions of the priorly existent programs retroactive to April 1st. Thereafter, Bethlehem moved for and was granted by this Court October 10, 1984 a stay pending appeal with respect to that segment of the Judgment that had required immediate and retroactive application of the provisions of the pre-CMP medical insurance programs.
In conjunction with a December 6, 1984 scheduled pre-argument conference regarding Bethlehem's appeal to the United States Court of Appeals for the Second Circuit, the parties' counsel commenced settlement negotiations. An understanding was reached, reduced to writing and executed by such counsel January 25, 1985. The parties promptly moved before the appellate court to defer oral argument and for a remand of the action to this Court for consideration of the proposed settlement. Their joint motion was granted January 31, 1985. 735 F.2d 913.
On March 4, 1985 the parties submitted to this Court an executed Settlement Agreement as well as a joint application for approval of such. After having reviewed the Settlement Agreement and the proposed Bethlehem Permanent Health Program ("BPHP") that would thereunder be *216 instituted for plaintiffs, I tentatively approved the terms of the settlement in an Order filed March 11, 1985 which (a) amended the plaintiff class to include certain additional former Bethlehem employees, (b) extended the class action to encompass the claims contained in all six causes of action in the Amended Complaint, (c) modified the Judgment as partially stayed to permit Bethlehem to collect specified premiums from plaintiffs as of March 1, 1985 and (d) approved the form of the "Notice of Proposed Settlement of Class Action" to be sent to class members and directed that Bethlehem mail such to each plaintiff no later than March 11, 1985. In addition, the Order regarding the proposed settlement established April 15, 1985 as the deadline for the filing with the Clerk of this Court of any objections to the proposed settlement and designated 12:00 p.m., April 29, 1985 as the time for the hearing before this Court with respect to the fairness and appropriateness of the proposed settlement.
The notice sent to each class member explained the background of this action, summarized the terms of the proposed settlement and the BPHP that would be established if the settlement were approved, and notified plaintiffs of the "non-opt out" nature of their class membership and of their rights to file written objections to the settlement proposal, to employ their own counsel to present any objections, to review the proposed Settlement Agreement, and to appear and be heard at the April 29th hearing before this Court.
Having considered the terms of the Settlement Agreement, the objections filed thereto, the affidavits that have been filed in support of the proposed settlement, the statements made during the course of the April 29th hearing, and being fully familiar with the facts and procedural history surrounding this action, this Court finds that the proposed settlement is an equitable and satisfactory resolution of this lawsuit. The possibility of one or more appeals in this case and further protracted litigation has been eliminated and plaintiffs have achieved security regarding their health care and life insurance coverages while agreeing to pay relatively modest premiums for rather comprehensive health care coverage containing limited deductible levels that will be incurred by them. As expected regarding any settlement of a legal action, both parties chose to make reasonable concessions in order to avoid the risks, anxiety and expenses that would have resulted from further litigation.
Although the plaintiff class in this lawsuit is comprised of over 18,000 individuals, fewer than fifty objection letters regarding the proposed settlement were filed with this Court.[2] Nevertheless I have reviewed each letter and have considered each contention raised in reaching my determination that the proposed settlement represents a fair termination of this litigation.
The majority of the letters are from pensioners asserting that they had been promised certain health care benefits upon their retirement from Bethlehem's employ and that the company should not now be permitted to renege on its word. Other objectors point to the similarities between the proposed BPHP and the CMP program, the adoption of which had precipitated this lawsuit. Some pensioners object to specific features in the BPHP  such as the lifetime limitation on insurance coverage of $500,000 per participant, the precertification requirement pertaining to certain medical services and the yearly deductible and "out-of-pocket" provisions. A few pensioners have objected to the aspect of proposed settlement that would allow Bethlehem to deem the CMP to have been properly in place from April 1, 1984 to the date of the implementation of the BPHP and to treat claims that had accrued during such period *217 as arising under and to be processed under the terms of the CMP.
Having considered these objections in view of all the circumstances surrounding this litigation and the proposed settlement, this Court does not find that the objections individually, or collectively, warrant disapproval of the settlement. The BPHP to be instituted for all class members under the settlement will not be subject to termination or modification by Bethlehem and Bethlehem has agreed as a term of the settlement to waive all premiums for health care coverage provided to the plaintiff class for the period April 1, 1984 through February 28, 1985. Furthermore, the settlement provides that life insurance benefits of class members that were applicable at the date of each pensioner's retirement will remain in effect during the respective pensioner's lifetime.[3]
Although there are numerous mutually comparable provisions to be found in the CMP and the BPHP, it must be recognized that, if Bethlehem's position were to be accepted upon its appeal to the United States Court of Appeals for the Second Circuit or subsequently to the United States Supreme Court, Bethlehem would have had plenary authority to diminish the coverage provided under the CMP or to terminate such program in its entirety at its whim. The lifetime limit on benefits coverage of $500,000 per insured is not unreasonable and it is further noted that it is possible that the precertification procedure could have been instituted as an administrative alteration even under the pre-CMP programs.
In summary, this Court finds that the proposed settlement adequately protects the interests of all class members, that the reaction by the class to the settlement has been overwhelmingly favorable, and that the substantive terms of the settlement are fair to plaintiffs in light of the complexity of this litigation, the attendant risks, additional expenses and other disadvantageous circumstances that could result from further litigation of this matter.
Accordingly, it is hereby ORDERED that the Settlement Agreement filed March 12, 1985 is approved, that pursuant to the terms of said agreement plaintiffs' Amended Complaint together with all claims which were or might fairly have been alleged under the facts therein is dismissed with prejudice without costs to any party as to all members of the expanded class as described in this Court's March 11, 1985 Order, that this Court's Memorandum and Order dated September 17, 1984 and Judgment entered on such date as well as the Amended Judgment entered September 25, 1984 are vacated, that counsel for plaintiffs may apply to this Court for an award of fees and reimbursement of their disbursements in connection with this litigation including moneys expended by members of the plaintiff class in furtherance of the action, and that this Court shall retain jurisdiction over this action until implementation of the new Bethlehem Permanent Health Program is completed for the purpose of issuing any additional orders needed to effectuate, clarify or enforce the terms of the Settlement Agreement.
NOTES
[1] 29 U.S.C. § 1132(a)(1)(B) authorizes a civil action by an ERISA plan participant to recover benefits due, to enforce rights under the terms of the plan or to clarify rights with respect to future benefits pursuant to the terms of such plan.
[2] In an Order filed May 9, 1984 I had certified this action as a class action pursuant to Fed.R. Civ.P. rule 23(b)(2) solely with respect to the claim asserted in the first cause of action of the Amended Complaint. Plaintiffs have estimated that the class so certified is comprised of 18,169 persons who were or are eligible for coverage under Bethlehem's Comprehensive Medical Program for former non-represented employees.
[3] The Plan is an amended version of Bethlehem's Social Insurance Plan instituted in 1950 (Defendants' exhibit 1), revised as of July 26, 1951 (Defendants' exhibit 2) and contains many provisions identical to the earlier versions. Certain modifications and additions were made including the setting forth of definitions of terms and fiduciary responsibilities created by the passage of ERISA.
[4] 29 U.S.C. § 1002(1) provides in part:

"(1) The terms `employee welfare benefit plan' and `welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services * * *."
[5] A transcript thereof is not yet in existence.
[6] Each of many witnesses testified regarding receipt of an "exit interview" shortly before the date of his retirement wherein a Bethlehem employee from the pension or employee benefits department explained the specific pension, vacation, life insurance and health benefits that would be received by the prospective retiree after the termination of his service with Bethlehem.
[7] The terms "exempt" and "non-exempt" as utilized in Bethlehem's benefit booklets referred to the applicability vel non of the provisions of the Federal Labor Standards Act, 29 U.S.C. § 201 et seq., to a particular employee.
[8] A release from the Department of Labor dated May 21, 1984 expressed the Department's view that plan termination is a circumstance which may result in the loss of benefits of a participant and that a plan's provisions concerning such should be included in the summary plan description required by 29 U.S.C. § 1022. Such position is not pertinent to the question whether the Plan documents themselves in the case at bar precluded termination of benefits.
[9] Section 4.25 and 4.26 of the program provided for termination of coverage when a participant requested such, when a surviving spouse remarried or when the person was no longer eligible for coverage under section 4.0 of the Program  i.e., was no longer a United States resident.
[10] As was previously stated in my Order of June 22, 1984, plaintiffs' acknowledgment that ERISA does not specifically provide for vesting of health care benefits as it does for pension benefits  see 29 U.S.C. §§ 1051 to 1061  does not bear upon the permissibility vel non of a reduction of welfare benefits by Bethlehem under the express and implied terms of the Plan documents themselves in the case at bar.
[11] Plaintiffs' exhibits 5 and 44 contained similar language in their forewards although exhibit 5 at least described the "Plan" as the "Program of Insurance Benefits for Exempt Salaried Employees under the Social Insurance Plan of Bethlehem Steel Corporation and Subsidiary Companies." (Emphasis added.)
[12] Plaintiffs' exhibits 5 and 44 contained similar eligibility and termination provisions.
[13] The legislative history of ERISA as set forth in 1974 U.S.Code Cong. & Ad.News, 4639, 5077-5078 and quoted in Myron v. Trust Co. Bank Long Term Dis. Ben. Plan, supra, is indicative of Congress's contemplation that an employee welfare benefit plan could be comprised of more than one document setting forth the rights and obligations of the participants under such plan.
[14] Article I, Sections 1(a), 1(c) & 1(j) of the Plan provide:

"(a) The term `benefits program' means a program of social insurance benefits, and the term `benefits program hereunder' means a benefits program which shall be established under this Plan for all the employees or a particular group or class of employees."
"(c) The term `employee' means a person who at the particular time is employed in any capacity by an Employing Company and shall include also a person who has retired from the employ of an Employing Company and who at that time receives or is eligible to receive a pension under any then existing pension plan of Bethlehem Steel Corporation and its subsidiary companies."
"(j) The term `social insurance benefits' means death, sickness, accident, disability, hospitalization, dental, medical surgical or similar benefits or any two or more of such benefits, but it shall not be deemed to mean or include any pension granted under any pension plan or any separation allowance or other similar payment."
[15] Article II, Section 2 provides in part:

"SECTION 2. Plan not Applicable to a Subsidiary unless Approved by It. This Plan shall not be applicable to or binding upon any Subsidiary Company, unless such Subsidiary Company, by resolution of its Board of Directors, shall have adopted this Plan and any Trust Agreement and the trust created thereby * * * provided, however, that, if a benefits program shall have been established hereunder which shall then cover any employee of such Subsidiary Company, a revocation by it of the adoption of this Plan shall not so operate as to deprive any such employee who is a participant in such program, his dependents and his beneficiaries of benefits to which any of them shall theretofore have become entitled under such program."
[16] Article IV, Section 3 of the Plan provides:

"SECTION 3. Merger of and Changes in Programs. Subject to the direction and control of the Insurance Board, the Plan Administrator shall have the power at any time to merge any two or more benefits programs hereunder and to change the class or classes or group or groups of employees which are covered by a particular benefits program hereunder, provided, however, that no such action shall deprive any participant in a benefits program hereunder, his dependents or beneficiaries of any benefits to which any of them shall theretofore have become entitled under such program."
[17] Article VII, Section 1 states:

"RIGHTS AND OBLIGATIONS OF PARTICIPANTS
"SECTION 1. How Provided and Described. The rights and obligations of a participant in a benefits program hereunder shall be as provided in the policy or policies of group insurance whereby such program shall be effectuated and as provided in any other writing relating to such program that shall describe the rights and obligations of such participant therein."
[18] Although Bethlehem has not yet announced an intention to reduce or cancel pensioners' life insurance coverage, the testimony and documents received regarding such issue were pertinent to the terminability of health benefits inasmuch as life insurance is a social insurance benefit under the Plan, equally covered by Article XI, Section 2. The representations made by Bethlehem employees to pensioners and the documentation with respect to the duration of life insurance coverage were relevant to defendants' contention that all programs under the Plan were cancelable at any time due to Article XI, Section 2 of the Plan.
[19] Although this program was apparently a separate ERISA plan and not a benefits program under the Social Insurance Plan (there is no mention of the Plan in any of the booklets, contributions were required of all participants and benefits under such Plan were provided in accordance with agreements between Bethlehem and Blue Cross and Blue Shield), it is noted that the post-ERISA booklets, Defendants' exhibits 45 and 46, also contained specific reservation of termination language further alerting Bethlehem to the importance of setting forth the reservation of such right.
[20] Analysis of these booklets establishes that those programs for exempt and non-exempt active employees contained termination reservations prior to August 1, 1975 at which time the booklets for exempt salaried employees dropped such provision (perhaps in conjunction with the booklet for pensioners, effective August 1, 1975 [Defendants' exhibit 34] which contained no such reservation). The August 1, 1975 booklet for non-exempt salaried employees contained a change or termination of benefits reservation (perhaps in conjunction with the retention of such right in Defendants' exhibit 35 for pensioners, also effective that date). The 1979 and 1981 non-exempt employees' booklets had dropped the reservation of right to terminate language, such practice being consistent with the non-retention of any right to terminate benefits of pensioners under Defendants' exhibit 37 and Plaintiffs' exhibits 5 and 44.
[21] The similarity between the terminology of the second paragraph of this section and Sections 1 and 2 of Article XI of the Plan has been recognized and considered by this Court. However the absence of such language from the pertinent booklets setting forth pensioner benefit programs, its inclusion solely in an active employees booklet, the utilization of such language in 1983, as well as all of the other evidence received at the hearing has convincingly demonstrated that this provision's resemblance to Article XI of the Plan was not supportive of defendants' position.
[22] The full text of provision 6 was set forth previously at page 205.
[23] Such number is a lawyer's index.
[24] Defendants contended that there had been prior reductions of benefits in pensioners' programs and that such fact demonstrated the permissibility of the adoption of the CMP. However, plaintiffs' acquiescence to a previous reduction in benefits would not establish a waiver of the rights asserted by this action or that such prior action was necessarily proper under the Plan documents' provisions. Moreover the only reduction in any pensioners' coverage actually testified to was a March 1, 1983 change whereby changes previously covered by Major Medical solely because of state-mandated legislation were no longer covered. (Defendants' exhibit 63).
[25] Defendants' additional argument that the Plan Administrator's interpretation of the Plan's provisions must be accepted unless demonstrated to be arbitrary and capricious is rejected inasmuch as such standard is inapplicable to the claim presented by this initial cause of action. This is not an action involving a rejected applicant's claim of entitlement to benefits as in Miles v. New York State Teamsters Conference, Etc., 698 F.2d 593, 601 (2d Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 105, 78 L.Ed.2d 108 (1984), but rather an assertion that a non-discretionary action by defendants' Insurance Board violated the express terms of the Plan documents. There have been neither personal claims for benefits in this litigation nor questioning of an interpretation by the Plan's Administrator as to such. Furthermore, Kempken's interpretation of the Plan documents, in a manner inconsistent with the clearly explained meaning of such terms by Bethlehem's agents and distributed literature, was in fact arbitrary and capricious.
[26] Inasmuch as defendants have contended that the CMP actually provided more favorable coverage and terms to many plaintiffs, Bethlehem remains free to offer the CMP to pensioners as an optional alternative to the prior existing health care programs.
[1] In an Order filed May 9, 1984 I had certified this action as a class action pursuant to Fed.R. Civ.P. rule 23(b)(2), solely in respect to plaintiffs' initial cause of action. The class consisted of "[a]ll persons who were or are now eligible for coverage under Bethlehem's Comprehensive Medical Program for former non-represented employees." The scope of such certification was clarified by this Court's October 29, 1984 Memorandum and Order which denied plaintiffs' motion to amend the September 25th Judgment.
[2] At the April 29th hearing no objector had appeared in order to voice his or her views regarding the proposed settlement. Daniel Drejas, a former Bethlehem employee who had been terminated subsequent to April 1, 1984, was permitted to make a statement in which he sought membership in the certified class for himself and certain other former Bethlehem workers.
[3] The question regarding Bethlehem's right to diminish or to terminate a pensioner's life insurance benefits merely had been tangentially raised during the prior proceedings and the evidentiary hearing before this Court.