IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8125

_____

GEORGE G. WISE, et al.,

Plaintiffs-Appellants,

versus

EL PASO NATURAL GAS COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before WILLIAMS, HIGGINBOTHAM and BARKSDALE, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Plaintiffs appeal from the district court's grant of summary judgment in favor of their former employer, El Paso Natural Gas Company (which, along with its successors in interest, we refer to as "El Paso").  In October 1985, El Paso informed its workers that anyone who retired after a specified cut-off date would no longer have their health insurance paid by the company.  Plaintiffs, upset that they "must devote a substantial portion of what was anticipated to be disposable retirement income to pay escalating health insurance premiums," argue that El Paso is contractually bound to provide their health insurance.  They also

maintain that under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), the company is statutorily obliged to do so.  The district court disagreed as to both assertions.  It concluded that El Paso had no statutory or contractual obligation to continue post-retirement benefits and was free to eliminate paid coverage.  We affirm.

## I.  FACTS AND PRIOR PROCEEDINGS

The underlying facts of this important case are uncontested. Plaintiffs are long-time employees of El Paso.  In 1959, fifteen years before the enactment of ERISA, El Paso began providing comprehensive medical insurance to its retirees.  From that date, the post-retirement medical plan (the "Plan") has been governed by a series of underlying insurance policies or plan documents which expressly grant El Paso the unilateral authority to modify or terminate coverage at any time.  El Paso has modified the Plan many times, choosing both to decrease and increase benefits.  From 1959 through 1976, the benefits plan was described in informal documents such as brochures and handbooks.

Upon ERISA's effective date in 1977, El Paso began to spell out the Plan's various rights and benefits in formal Summary Plan Descriptions ("SPDs").[1]  Twice in 1977 and again in 1980, El Paso

---

[1] ERISA mandates that every plan participant be given an SPD, which "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and

2

prepared and distributed to eligible participants editions of the statutorily-mandated SPD.  All three versions of the SPD are identical for purposes of the instant case and contained the following passage, from which Plaintiffs glean a promise of infinite duration:  "Upon retirement, you, your spouse, and eligible children under 19 years of age are automatically insured for retirement health care benefits and the Company pays the entire cost."  None of these SPDs expressly addressed El Paso's reservation of the right to amend or terminate the Plan's benefit provisions, but they advised readers to consult the Plan's official text for complete information.[2]

In December 1983, Burlington Northern, Inc. acquired El Paso, and, following a transition period, began to provide through its own plans the benefits flowing to El Paso's active workers and retirees.  Unlike the parent company and Burlington's other subsidiaries, however, El Paso continued to pay the full cost of its retirees' insurance.  A new disclosure rule floated by the Financial Accounting Standards Board, however, dramatically altered the situation.  The proposed requirement, that employers must reflect on their balance sheets the present value of the estimated

---

obligations under the plan."  29 U.S.C. § 1022(a)(1).

[2] El Paso contends that the plaintiffs did not rely upon the 1977 and 1980 SPDs in the district court but rely on them for the first time on appeal.  We conclude, however, that sufficient reference was made to these documents in the district court that the plaintiffs are not precluded from asserting their relevance on appeal.

3

future costs for retirees' medical benefits, portended a serious impact on Burlington's financial statements and prompted Burlington to commission an actuarial analysis of how the rule might shape its recorded liabilities. *See* <u>Financial Accounting Standards No. 106: Employers' Accounting for Postretirement Benefits Other Than Pensions</u> (1990).[3]

According to El Paso's motion for summary judgment, the new balance sheet liability and annual expenses were conservatively estimated to be "significantly greater than . . . for all of the other Burlington-held companies added together." Under the heading <u>LEGAL CONSIDERATIONS</u>, the actuarial report noted a recent pro-retiree court ruling and evinced concern that El Paso's pre-1985 SPDs, unlike Burlington's, may have failed to include language

---

[3] The new and much-publicized accounting rule, which ultimately took effect December 15, 1992, requires employers to adopt accrual accounting to expense accumulated benefits during employees' working careers rather than the past practice of waiting until the benefits are actually paid. While the change does not represent reductions in cash flow, it dramatically erodes estimates of net worth and pre-tax earnings as employers recognize the present value of projected post-retirement benefits.

El Paso is not alone in its strong response; FASB 106 has combined with other factors to redden the financial statements of many companies, particularly those providing generous benefits. *See, e.g.*, Robert L. Rose, <u>Chilly Sunset: Firms' Attempts to Cut Health Benefits Break Calm of Retirement</u>, THE WALL STREET JOURNAL, Febr. 24, 1993, at A1 (chronicling the jarring impact on various companies and their employees, and the firms' sober responses); Vineeta Anand, INVESTOR'S BUSINESS DAILY, Oct. 2, 1992, at Executive Update; Benefits, 4 (same); Lee Berton and Robert J. Brennan, <u>Some Companies Use Subtle Methods To Curb the Cost of Retiree Benefits</u>, THE WALL STREET JOURNAL, Febr. 24, 1993, at A14 (detailing the novel, blow-softening responses of several companies).

4

authorizing unilateral amendment and/or termination.[4]  Thus, in March and June 1985, El Paso began to lay the groundwork for future changes by issuing new SPDs which, for the first time, included the following language under the heading **"OTHER IMPORTANT INFORMATION"**:

> The Company reserves the right to alter, amend, delete, cancel or otherwise change the plan or any of the provisions of the plan at anytime [sic].  If the plan is terminated, coverage for you and your eligible family members will end.

A few months later, in October 1985, El Paso exercised that reserved right when it announced that it would continue to extend benefits only for employees who retired on or before March 1, 1986; anyone retiring after that designated cut-off date would forfeit company-paid coverage.[5]

---

[4] Apparently, the report was referring to the class action case, Eardman v. Bethlehem Steel Corp. Employee Welfare Benefit Plans, the approved settlement of which is cited at 607 F. Supp. 196, 215-17 (W.D.N.Y. 1985).  In Eardman, retired workers contested reductions in their benefits on the ground that the plan documents had not reserved the right to amend.  The district court had earlier found for the workers.  Id. at 196-215 (W.D.N.Y. 1984).  The opinion approving the settlement recognized the risk of reversal as one basis for approval.
In light of a recent article examining the implications of FASB 106, the report's concerns proved to be prescient:  "Experts say that employers should also examine the legal implications. For example, *employers may be unable to alter plans unilaterally if they have not specifically retained that right and put retirees on notice that the plan could be changed*."  New Accounting Rule for Retiree Benefits Will Force Employers to Change Practices, BNA PENSIONS & BENEFITS DAILY (Nov. 4, 1992)(emphasis added).

[5] Of special note is the fact that El Paso, while ceasing to provide free benefits for employees retiring after March 1, 1986, has nonetheless continued to maintain its Plan and to cover post-March 1986 retirees.  The record reflects the following:

> Under the Plan, post-March 1986 retirees are provided, at their own cost, (i) a number of benefits that would not be readily available to them in insurance contracts

5

On behalf of himself and other Plan participants, all of whom retired between October 1986 and August 1989, George G. Wise initiated this action in state court to contest El Paso's refusal to pay for their post-retirement health coverage under the Plan. Wise alleged a variety of state common law claims, including breach of contract, negligence, and breach of the duty of good faith and fair dealing. El Paso removed the action to federal court on the basis of ERISA preemption. *See* 29 U.S.C. § 1144(a). The parties now seem to agree that the instant suit is one to enforce the terms of an employee benefit plan under 29 U.S.C § 1132(a)(1)(B).[6] On March 10, 1992, the district court granted El Paso's motion for summary judgment. Plaintiffs timely appealed.

## II.  DISCUSSION

A.    Standard of Review

Although it is a "comprehensive and reticulated statute," Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 361,

---

and (ii) benefits at group rates significantly better than they could acquire as individuals in the open market. In addition, (iii) EPNG pays the full administrative costs of the Plan, including the portion of such costs related to post-March 1986 retirees.

[6] 29 U.S.C. § 1132(a)(1)(B) provides:

A civil action may be brought --
   **(1)** by a participant or a beneficiary -- * * *
        **(B)** to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), ERISA fails to set out the applicable standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations. The Supreme Court has filled the gap. We review *de novo* § 1132(a)(1)(B) actions challenging denials of benefits where the benefit plan fails to give the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct 948, 956, 103 L.Ed.2d 80 (1989). In this case, neither party has pointed to any Plan provision that expressly grants El Paso, the Plan's administrator, discretionary authority regarding entitlements. Accordingly, the district court's decision will be tested under the broader *de novo* standard. *See* Schultz v. Metropolitan Life Ins. Co., 872 F.2d 676, 678 (5th Cir. 1989).

B.   El Paso's Right to Amend and Terminate Coverage

We are spared a significant inquiry. As mentioned above, neither party disputes that the arrangement in question falls within ERISA's statutory definition of an "employee welfare benefit plan":

> [A]ny plan, fund, or program . . . maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits[.]"

29 U.S.C. § 1002(1).

Indeed, the Plan fits easily within the Act's broad coverage. *See generally* Id. at § 1002; *see, e.g.*, Meredith v. Time Ins. Co., 980

7

F.2d 352, 354-57 (5th Cir. 1993)(explicating ERISA's various definitional provisions).

1.   *ERISA's statutory requirements*

It is undisputed that nothing in ERISA requires an SPD to reference amendment rights or procedures.  While Plaintiffs concede that an SPD need not specify that it is subject to amendment,[7] they cite 29 U.S.C. § 1022(b), which requires an SPD to state the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  The gravamen of Plaintiffs' complaint is this:  because § 1022(b) requires an employer to warn participants of possible decreases in their benefits, El Paso "was <u>not</u> free to amend the plan if the amendment caused a loss of benefits." (emphasis in original).   Under the SPD heading, **"TERMINATION OF BENEFITS AND CONVERSION PRIVILEGES,"** El Paso listed three triggering events that would terminate a retiree's insurance: (1) death of the retiree; (2) remarriage of a surviving spouse; and (3) a dependent child reaching the age of 19.  Plaintiffs leap upon this seeming exclusivity:

> This language does <u>not</u> state, or even indirectly imply, that the coverage will be terminated for any other reason. . . . [The pre-1985 SPDs] indicate three, <u>and only three</u>, instances in which such coverage will end . . . . Neither document in any way directly or indirectly reserves any right to alter, amend, modify or change the policy.  (emphasis in original).

---

[7] The plaintiffs acknowledge that the underlying plan documents, as distinguished from the 1977 and 1980 SPDs, expressly set forth the company's right to modify the plan.

8

In sum, since the earlier SPDs failed to meet § 1022(b)'s disclosure requirement by including the possibility of unilateral amendment or termination, Plaintiffs insist that El Paso is estopped under ERISA from abolishing free, lifetime coverage.

The district court disagreed, pointing to the Plan itself and to the SPDs issued in 1985, all of which reserved to El Paso the unqualified right to alter or eliminate coverage. From this, the court concluded that "[r]etired employees such as the Plaintiffs in this case cannot claim entitlement to employer paid health benefits in perpetuity where the plan itself and the SPD make it clear that those benefits can be amended, modified, or even terminated at any time." Upon a review of applicable caselaw, we agree with the district court.

### (a) no vesting

Congress has conspicuously chosen to exempt welfare benefit plans from the full breadth of ERISA's extensive requirements. *Compare* 29 U.S.C. § 1002(2)(A) *with* § 1002(1) (distinguishing "employee pension benefit plans" from "employee welfare benefit plans"). Welfare benefits such as medical insurance, which may be ancillary to but are not part of a pension plan, are not subject to the rather strict vesting, accrual, participation, and minimum funding requirements that ERISA imposes on pension plans. *See* 29 U.S.C. §§ 1051 *et seq.* and §§ 1081 *et seq.* Accordingly, this Court and every other Circuit Court that

9

has considered the question agree that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); *see, e.g.*, McGann v. McGann Music Co., 946 F.2d 401, 405-07 (5th Cir. 1991), *cert. denied sub nom.* Greenberg v. H & H Music Co., -- U.S. --, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992); Adams v. Avondale Industries, Inc., 905 F.2d 943, 947-49 (6th Cir.), *cert. denied*, -- U.S. --, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

The disparate treatment accorded welfare plans is not accidental; indeed, its underlying rationale is highly pertinent to our decision today. In a similar case involving retirees who challenged their employer's decision to modify unilaterally its benefits plan, the Second Circuit explained:

> With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology and increases in the costs of treatment depending on inflation. These unstable variables prevent accurate predictions of future needs and costs.

Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).

10

We do not have the power to assume the legislator's role and welcome additional layers of obligations. The provision must be read in the light of ERISA's sweeping complexity. This is clearly not a case of inadvertent omission. In such cases of deliberate legislative inaction, the Supreme Court has issued a valuable admonition: "[L]egislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

Since an employee's interest in such benefits is not statutorily vested, El Paso is under no continuing obligation to provide them under ERISA. It possesses the right to amend or terminate coverage at any time. Section 1022(b) relates to an individual employee's eligibility under then existing, current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits.

(b)   can change with notice

Against this established law, two recent opinions from this Court interpreting ERISA's notification provisions posed

11

similar disclosure issues and support our decision today.  In Whittemore v. Schlumberger Technology Corp., 976 F.2d 922 (5th Cir. 1992), plaintiffs were former Schlumberger employees who sought severance pay under a provision of the company's policy manual that provided for such pay in lieu of notice of termination.  A December 1988 amendment, however, had revoked that practice if employees were terminated within a prescribed time and offered full-time employment by a company acquiring the Schlumberger division in which the employees worked.  In Whittemore, the amended severance plan, a welfare benefit plan under ERISA, became effective before plaintiffs' division was sold to another company.  Although admitting that the amendment "technically occurr[ed] before the employees' termination," Plaintiffs argued vigorously that Schlumberger violated ERISA by failing fully to disclose the terms of the amendment prior to the employees' discharge.  In an analysis applicable to the instant case, we observed:

> Even if this concession [that the amendment occurred prior to termination] were not enough, the district court specifically found that Schlumberger complied with ERISA's disclosure requirements in that "plaintiffs admit receiving copies of the amended severance . . . plan on February 7, and admit receiving a summary description of this plan change on March 8, 1989."  The plaintiffs do not dispute these facts.
>
> The plaintiffs acknowledge that Schlumberger gave notice within the time permitted by ERISA.  They argue only that "such a technical reading of the disclosure provisions . . . work [sic] an inequitable result and give [sic] effect to form over substance."  We conclude, to the contrary, that *Schlumberger was entitled to give notice within the statutory notice period and was not required to provide it sooner.*  The plaintiffs' argument is without merit.

Id. at 923-24 (emphasis added).

12

The instant plaintiffs concede that they received the revised SPDs prior to El Paso's termination. Moreover, El Paso provided a reasonable window during which eligible employees could choose to retire with full, company-paid coverage. El Paso's workers, like those in Whittemore, were placed on notice, however perfunctory, that retirement after the prescribed date would result in the forfeiture of free coverage.

Our recent decision in Godwin v. Sun Life Assurance Co. of Canada, 980 F.2d 323 (5th Cir. 1992), decided after arguments in the instant case, also concerned ERISA's disclosure requirements. In Godwin, the plaintiff contended that an amendment to his welfare benefit plan was inapplicable to him because he had never received personal notice of the amendment. Although Sun Life issued updated SPDs following each amendment to the plan, Godwin maintained that his nonreceipt of notice of the change rendered it invalid as to him. Framing the issue as whether the plan sponsor complied with the ERISA requisites for plan modifications with respect to Godwin, we held:

> We agree with the district court that an amendment to a welfare benefit plan is valid despite a beneficiary's lack of personal notice, unless the beneficiary can show active concealment of the amendment, Blau v. Del Monte Corp., 748 F.2d 1348, 1352 (9th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), [footnote omitted], or "some significant reliance upon, or possible prejudice flowing from" the lack of notice. Govoni v. Bricklayers, Masons and Plasterers Int'l Local No. 5 Pension Fund, 732 F.2d 250, 252 (1st

13

Cir. 1984). Here, there is no evidence of active concealment, and Godwin can show neither significant reliance nor prejudice from his alleged lack of notice. (footnote omitted).

Id. at 328.

In the instant case, Plaintiffs' assertions are weaker than Godwin's. They cannot dispute that they received personal and unambiguous notice of the prospective change months before it became effective. El Paso concedes that the SPDs could possibly suggest an "arguable commitment" to continue coverage for workers retiring before the effective date and points out that it has in fact extended post-retirement insurance to such retirees. The instant plaintiffs, however, are asking us to do what neither Congress nor any other court has ever done -- impose vesting for employees who had not retired as of the date of the disputed change.

Plaintiffs complain strenuously that no pre-1985 SPDs contained the amendment/termination language. This omission, they insist, is tantamount to a promise to maintain post-retirement health care: "If the SPD's . . . contain such a promise, EPNG must honor its commitment and cannot avoid that obligation, even by amending its plan documents." We do not agree, particularly when (1) ERISA does not mandate the inclusion within SPDs of amendment rights or procedures and (2) any pre-1985 silence is followed by an unequivocal statement to the contrary. El Paso's failure to include that which ERISA does not require cannot act to prejudice

14

El Paso by imposing an infinite duty. Although Plaintiffs acknowledge that it is "technically true" that amendment procedures and rights need not be included in the SPD, they insist that when amendments compromise benefits previously offered, they must be precluded under § 1022(b). This argument is fanciful. Plaintiffs must concede that amendments, almost by definition, do not always herald pro-beneficiary news. The average plan participant must realize that amendments to welfare benefit plans are not enacted for the sole purpose of augmenting benefits, but often to diminish them as well.

We are sensitive to Plaintiffs' earnest concerns and realize that today's decision works a significant hardship on workers who have invested, in many cases, most of their lives in service to the company. Across the nation, companies faced with rapidly rising costs and worried about their competitiveness are paring retiree benefits that were once considered sacrosanct. But ERISA simply does not grant employees unfettered rights to the corporate treasury. Employers need not abandon prudent business behavior when marketplace forces compel them to rethink earlier offers of contingent, non-vested benefits. In light of today's spiraling health care costs, cutbacks in government-sponsored health care coverage (Medicare), and our ever-aging population, Congress may enact changes. But the current ERISA requires no more.

15

2.    *Contractual Vesting?*

There remains the question whether the instant dispute can be recognized as a contract case, rather than a statutory one. Plaintiffs urge this interpretation, insisting that even if ERISA does not provide a statutory bar to El Paso's actions, the company has incurred *contractual* obligations beyond ERISA to provide free, lifetime coverage.

We held above that although ERISA includes elaborate vesting requirements for pension plans, *see* 29 U.S.C. § 1053, "it does not require that welfare plan benefits 'vest' or that an employer maintain them at a certain level." Vasseur v. Halliburton Co., 950 F.2d at 1002, 1006 (5th Cir. 1992); *see also* McGann, 946 F.2d at 405. Although ERISA generally allows employers to modify or discontinue such plans at will so long as the procedure followed is consistent with the plan and the Act, we have held that an employer's welfare plan itself may designate a vested benefit. In Vasseur we stated: "An employer can oblige itself contractually to maintain benefits at a certain level in ways that are not mandated by ERISA." 950 F.2d at 1006. *See also, e.g.*, In re White Farm Equipment Co., 788 F.2d 1186, 1193 (6th Cir. 1986).

It follows that El Paso could have waived its statutory right to modify or terminate benefits and vested its workers contractually with the right to receive free lifetime coverage. We

16

cannot find such an obligation, however, anywhere in the record in this case. Such extra-ERISA commitments must be found in the plan documents and must be stated in clear and express language. Neither the particular terms of El Paso's master policy nor its pre-1985 SPDs come close to encompassing such a binding pledge. *See, e.g.*, Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir. 1990)("[A]ny retiree's right to lifetime medical benefits at a particular cost can only be found if it is established by contract *under the terms of the ERISA-governed benefit plan document*.")(emphasis added), *cert. denied*, -- U.S. --, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); In re White Farm Equipment Co., 788 F.2d at 1193 ("[T]he parties may themselves set out by agreement or by private design, *as set out in plan documents*, whether retiree welfare benefits vest, or whether they may be terminated.") (emphasis added).

El Paso's plan documents and SPDs describe the extent of benefits provided under the Plan; they make no reference to a vesting of such benefits. El Paso's statement in the pre-1985 SPDs that "[u]pon retirement, you . . . are automatically insured for retirement health care benefits and the Company pays the entire cost" discussed what the Plan then provided, not whether it would be offered in perpetuity. As to yet-unretired workers, no commitments were made. Nowhere does the SPD contain specific language establishing a vesting of health benefits. If precise language denying the right to withdraw benefits had been included,

17

such language would be contractually controlling. *See* <u>Bryant v. International Fruit Products Co., Inc.</u>, 793 F.2d 118, 123 (6th Cir.)("An agreement that provides that an act can occur in no event and under no circumstances cannot be converted into one that permits the act by a series of amendments that first deletes the reference to the prohibition and then adds a provision permitting the forbidden act."), *cert. denied*, 479 U.S. 986, 107 S.Ct. 576, 93 L. Ed.2d 579 (1986).

Aside from the fact that the underlying documents and the later SPDs *did* place employees on firm notice of the coming change, we find no reason or authority to conclude that pre-1985 silence in the SPDs is somehow tantamount to an affirmative contractual commitment and that El Paso's earlier SPDs impliedly cede the right to later amend or discontinue coverage. While clear and unambiguous *statements* in the summary plan description are binding, the same is not true of silence. There is nothing in the way of context, inference, or presumption to persuade us otherwise. Contractual vesting is a narrow doctrine. To prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation.

Even assuming, however, that the pre-1985 SPDs contained an implied promise of continued benefits for future retirees, these earlier summaries cannot govern the instant case because they are no longer in effect. The SPDs issued in 1985 cover these

18

plaintiffs before us and therefore control our analysis. El Paso's earlier SPDs cannot be read in isolation, and in no way can they be construed to preclude the possibility of future amendment. Upon a careful review of the summary judgment record, and with particular emphasis upon the applicable 1985 SPDs which clearly highlight El Paso's right to amend or terminate post-retirement benefits, we conclude that no basis can be found in the language of the earlier SPDs or in the plan documents to counter El Paso's reserved right to do so. "Absent such a contractual assurance, ERISA permits an employer to decrease or increase benefits." <u>Vasseur</u>, 950 F.2d at 1006.

Finally, we address Plaintiffs' argument that the 1985 SPDs are themselves inconsistent and that the rules of construction announced in our recent case, <u>Hansen v. Continental Insurance Company</u>, 940 F.2d 971 (5th Cir. 1991), mandate that we adopt the most pro-beneficiary interpretation. Specifically, Plaintiffs contend that El Paso's failure to include the possibility of amendment or termination under the SPD heading, **WHEN YOUR COVERAGE WILL END,"** (listing it instead under the heading **"OTHER IMPORTANT INFORMATION"**), must be construed as a promise to provide free health benefits. "Under <u>Hansen</u>," the plaintiffs maintain, "the test is whether or not one provision of an SPD, taken in its most natural reading, would entitle Plaintiffs to lifetime benefits. If so, they are entitled to lifetime benefits." (citing <u>Hansen</u>, 940 F.2d at 981, n.7). We agree that <u>Hansen</u> is a case of significant

19

guidance and authority on this issue, and Plaintiffs cite the general rule accurately. But close analysis reveals that it does not buttress their position.

In Hansen, the plaintiff disputed payments made to him under a group accidental health and dismemberment policy following the death of his wife in an automobile accident. Hansen contended that under the insurer's SPD, he was due $120,000, 60 percent of the amount of coverage. Continental relied instead upon the conflicting terms of the underlying policy and responded by tendering a check for $80,000, 40 percent of the principal sum. The company argued that the SPD had to be read in concert with the plan document, and if doing so revealed ambiguity or conflict, the plan's terms must control. We disagreed. After finding federal jurisdiction under ERISA, we determined that the essential purpose of an SPD -- "to enable the average participant in the plan to understand readily the general features of the policy" -- would be undermined if workers were held to the complex, master policy whenever the statutorily-mandated SPD was either ambiguous or in outright conflict with the policy. Id. at 981. Refusing to adopt a rule that would "eviscerate" ERISA's requirement that an SPD be "sufficiently accurate and comprehensive to reasonably apprise" plan participants of their rights and duties under the plan, we concluded:

> [T]he ambiguity in the summary plan description must be
> resolved in favor of the employee and made binding
> against the drafter. Any burden of uncertainty created
> by careless or inaccurate drafting of the summary must be

20

placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask. And it is especially not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action--causes of action which threaten considerably greater liability than that allowed by ERISA.

Id. at 981-82 (and quoting 29 U.S.C. § 1022(a)(1)).

Plaintiffs urge that the present case parallels our concerns in Hansen, where we addressed Continental's argument that the certificate of insurance that was included at the back of the SPD -- and which asserted a payout percentage of 40 percent -- should be considered part and parcel of the SPD. Assuming that erroneous contention to be true, we still saw no help to Continental since "[a]t least one provision of the summary plan description, taken in its most natural reading, would entitle Hansen to 60% of the principal sum." Id. at 981, n.7. Plaintiffs focus upon this narrowly-used language:

Certainly, parts of the 1985 SPD, taken in their most natural natural reading . . . constitute a commitment for non-contributory retiree insurance until death, remarriage of a surviving spouse, or loss of eligibility status by dependent children. Hence, under the rationale of footnote 7, Plaintiffs are entitled to that benefit. The concurring opinion of Judge Garwood is expressly based upon footnote 7.

The above language, however, was used in a carefully limited context. A careful reading of Hansen, and particularly footnote 7, reveals that its principal concern was with *positive* inconsistencies, either within the SPD or between the SPD and the master documents. None exist here. The amendment/termination

21

language was clearly included in the body of the SPD itself in the case before us. Plaintiffs attempt to manufacture ambiguity by asserting that El Paso's inclusion of amendment/termination authority within the 1985 SPDs was *misplaced* -- listed under **"OTHER IMPORTANT INFORMATION"** instead of under **"WHEN YOUR COVERAGE WILL END"** -- and that this location created irreconcilable ambiguity. This argument is without merit. As we held in <u>Hansen</u>, "the summary plan description must be read as a whole. It would be error to attend only to one paragraph, page, or portion of the summary." <u>Id</u>. at 981 (citing <u>Sharron v. Amalgamated Ins. Agency Servs., Inc.</u>, 704 F.2d 562, 566-67 (11th Cir. 1983)). Based upon our reading of the SPDs as an integrated whole so as to give effect to all of the provisions, Plaintiffs' argument that El Paso has promised lifetime continuation of employer-paid medical benefits must fail.

Although a beneficiary's view of an SPD is important, the correct interpretation cannot be "unrealistically narrow." <u>Sharron</u>, 704 F.2d at 566 (To "focus on only one page of the summary [would] represent[] an unrealistically narrow view of how a reasonably prudent employee would read and review this important document."). The three listed occurrences that would result in termination of an individual's benefits speak only to the elimination of coverage on an individual basis and do not address the continuation of the Plan as a whole. We find no basis in the language of the documents to contradict El Paso's unequivocal reservation of the right to modify or eliminate coverage

22

prospectively as to employees retiring after March 1, 1986.  The terms of the governing 1985 SPDs are clear and consistent with the reservation of rights set out in the Plan itself.[8]

### III.  CONCLUSION

In sum, El Paso exercised its reserved, unambiguous right under ERISA to amend its Plan with respect to health benefits, and it accurately described that change in the governing 1985 SPDs. Additionally, El Paso did not incur, nor intend to incur, any extra-ERISA obligations.  El Paso was free to make such a business decision pursuant to its reserved right.  There being no violation of ERISA, nor any affirmative contractual commitment denying El Paso's right to withdraw health benefit coverage, the judgment of the district court was correct.

AFFIRMED.

---

[8]  We do not consider the issue whether plan participants should prevail in instances where the employer fails to inform them in the SPD that their benefits are subject to unilateral change and/or termination.  That issue does not arise in this case.