Rick L. **GIUNTA**, Plaintiff,

v.

**MOBIL CORPORATION EMPLOYEE SEVERANCE PLAN, Defendant.**

No. CIV.A.G–01–677.

United States District Court,
S.D. Texas,
Galveston Division.

June 6, 2002.

Geoffrey Clark Guill, Manne & Guill, Baytown, for Rick L Guinta, plaintiffs.

William Scott Helfand, Magenheim Bateman et al, Houston, for Mobil Corporation Employee Severance Plan, defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), challenging the Plan Administrator's denial of severance benefits. Now before the Court are Plaintiff's and Defendant's competing Motions for Summary Judgment. For the reasons articulated below, Defendant's Motion is hereby **GRANTED** and Plaintiff's Motion is hereby **DENIED.** Plaintiff's claims are conse-

quently hereby **DISMISSED WITH PREJUDICE** in their entirety.

## I.

Plaintiff Rick L. Giunta ("Giunta") began working for Mobil Corporation as an operations engineer on January 14, 1987.[1] In December of 1988, Exxon Corporation ("Exxon") and Mobil Corporation ("Mobil") announced a proposed merger. Shortly prior to the merger, in August of 1999, Mobil issued the Mobil Corporation Employee Severance Plan Summary ("the SPD"). The SPD summarized the terms of the Mobil Corporation Employee Severance Plan ("the Plan"), an ERISA welfare benefit plan.[2] As outlined in the SPD, the Plan had two primary objectives: to provide transition income to employees who lost their employment after the merger or any other "change in control" of Mobil, and to encourage employees to remain with the corporation until their employment was terminated. Under the terms of the Plan, an employee in Giunta's position, also known as a Tier 4 employee,[3] was eligible for severance benefits if his employment was terminated within two years following the merger "by the Employer other than for good cause" or "by the Eligible Employee for Good Reason." A "good reason" was defined in Section 1.12 of the Plan as "the relocation of the Tier 4 employee's principal place of employment to a location more than fifty (50) miles from the Tier 4 Employee's principal place of employment" occurring on or after the date of the merger "without the Tier 4 employee's written consent." In anticipation of the merger, Mobil also developed formal notification procedures, including the ExxonMobil Assignment Decision Form ("the ABCD Form"), which employees were ostensibly supposed to sign when accepting or rejecting a job after the merger. Employees presented with the ABCD Form were asked to initial one of four choices (labeled "A," "B," "C," or "D"), either accepting the position with the understanding that a "good reason" existed under the Plan, accepting the position with the understanding that a "good reason" did not exist under the Plan, declining the position with the understanding that a "good reason" existed under the Plan, or declining the position with the understanding that a "good reason" did not exist under the Plan.

On November 30, 1999, Exxon and Mobil merged into ExxonMobil Corporation ("ExxonMobil"), thereby fulfilling the "change in control" criteria set forth in the Plan. At the time of the merger, Giunta was working as a subsea engineer at Mobil's New Orleans facility. Immediately following the merger, ExxonMobil offered

---

1. Apparently, Giunta was hired by Mobil Corporation on October 15, 1986.

2. ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), and "to protect contractually defined benefits," *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). *See generally* 29 U.S.C. § 1001 (setting forth congressional findings and declarations of policy regarding ERISA). The Parties agree that the Plan at issue is an employee welfare benefit plan covered by ERISA. ERISA § 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *See* 29 U.S.C. § 1132(a)(1)(B).

3. Mobil employees were classified into one of four tiers based upon their salary grade or group. Tier 1 employees were in salary groups 30 or higher; Tier 2 employees were in salary groups 25 through 29; Tier 3 employees were in salary groups 20 through 24; and Tier 4 employees were persons who were not in Tiers 1, 2, or 3. Under these definitions, Giunta was categorized as a Tier 4 employee.

Giunta a position in New Orleans, which Giunta accepted by signing the ABCD Form on December 10, 1999.[4] Approximately one month later, ExxonMobil offered to relocate Giunta to a position in Houston, a location more than fifty miles from his principal place of employment in New Orleans. Giunta requested to delay the relocation because of his "family situation" until March of 2000, and ExxonMobil agreed. Giunta then filled out and submitted an ExxonMobil Relocation Authorization Form, stipulating that his effective date of transfer would be on March 1, 2000. On that date, Giunta began working at ExxonMobil's Houston facility. During this time, Giunta commuted to Houston each week from his home in New Orleans, and lived in corporate housing while in Houston. Giunta also submitted numerous Relocation Expense Reports to ExxonMobil for lodging and transportation expenses, all of which were reimbursed by ExxonMobil. These expenses included a house-hunting trip to Houston for Giunta and his wife, and two trips to Houston for Giunta's wife for job-interviewing purposes. Giunta also requested and received a one-month relocation salary typically provided to ExxonMobil employees who were permanently relocating to assist with miscellaneous expenses such as security deposits and installation fees. ExxonMo-

bil's reimbursements to Giunta totaled $29,587.20.

After working at ExxonMobil's Houston facility for nearly five months, Giunta tendered a letter to ExxonMobil on July 19, 2000 stating that he wished to decline the relocation to Houston for personal reasons associated with the relocation of his family, and agreeing to work for ExxonMobil through July 31, 2000. Prior to tendering this letter, Giunta claims that he expressed his desire to return to ExxonMobil's New Orleans facility, but was not offered comparable employment at that location. During his exit interview, Giunta also indicated that his primary reason for declining the relocation to Houston was the "higher cost of living area without a significant increase in salary." ExxonMobil treated Giunta's July 19, 2000 letter as a letter of resignation, and informed Giunta during his exit interview that he was not eligible for severance benefits under the Plan. Following the termination of his employment with ExxonMobil, Giunta immediately commenced working at Halliburton Energy Services ("Halliburton"), a company also located in Houston. In fact, the record reveals that Halliburton offered Giunta a position on June 23, 2000, and Giunta accepted the position sometime between July 10–13, 2000, several days prior to declining the relocation with ExxonMobil.[5] On August 25, 2000, Giunta submitted a letter to

---

4. Giunta initialed option "A," which stated: "I accept the position of employment with ExxonMobil as described to me. In so doing, I understand *there are not* any 'Good Reasons' under the Mobil Corporation Employee Severance Plan."

5. The Court is deeply troubled by the inconsistencies in the record regarding the exact dates that Giunta began negotiating with Halliburton regarding potential employment opportunities, commenced working at Halliburton, and actually completed his employment with ExxonMobil. Giunta repeatedly avers in his pleadings and deposition that he was first contacted about a position with Halliburton in July of 2000, that he accepted a position with Halliburton on July 28, 2000, and that

his last day of employment with ExxonMobil was on August 7, 2000. However, Halliburton's personnel records reveal that employment negotiations may have begun as early as May of 2000 (according to a Halliburton employee's scheduling calendar), that a formal offer letter was issued to Giunta on June 23, 2000, that Giunta accepted the position sometime between July 10–13, 2000 (Halliburton was in the process of scheduling a drug test for Giunta on July 10, 2000), and that Giunta's effective start date with Halliburton was on July 28, 2000. Although these factual discrepancies are not impressive upon the Court's instant ruling, they are disturbingly indicative of a potentially sinister motive on the part of Giunta in accepting nearly $30,000 in relocation expenses from ExxonMobil, and

ExxonMobil seeking to appeal the denial of his severance benefits. On November 15, 2000, the Assistant Plan Administrator, Rodney Leis ("the Plan Administrator" or "Leis"), issued a letter denying Giunta's claim for severance on the ground that Giunta consented to the relocation to Houston, and therefore did not have a "good reason" for resigning. On January 30, 2001, Giunta asked the Plan Administrator to reconsider the denial of his severance benefits once again. Pursuant to this request, Leis again reviewed the Plan documents and other relevant information, and again determined that Giunta was not entitled to severance benefits under the Plan because he accepted the relocation to Houston, and then voluntarily resigned from his position. After twice failing to convince the Plan Administrator to overturn his decision, Giunta brought suit in this Court on October 19, 2001, seeking to recover $132,693.66 in severance pay allegedly owing to him under the Plan. Plaintiff and Defendant thereafter both filed Motions for Summary Judgment.

## II.

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When ruling on a motion for summary judgment, the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Generally, "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (emphasis added). If discretion is given in the plan either to determine eligibility or to construe its terms, the standard of review is the more lenient "abuse of discretion." *See id.* The Parties correctly assert in this case that the abuse of discretion standard applies because the Plan expressly grants discretionary authority to the Plan Administrator. The Court also notes that the decision of whether an abuse of discretion has occurred is based upon information known to the administrator at the time he made the decision. *See Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1015 (5th Cir.1992).

■ In evaluating Plaintiff's claim, the Court remains mindful of the Fifth Circuit's recent admonition that if a conflict arises on the part of the plan administrator, deference to the discretionary standard should be adjusted depending upon the nature of the conflict. *See Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir.1999) (en banc). Under this approach, the "court always applies the abuse of discretion standard, but gives less deference to the administrator in proportion to the administrator's apparent conflict." *Id.* at 296. Thus, "[t]he greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297. In the present case, Giunta contends that a conflict of interest exists because the Plan is unfunded, meaning that

---

then demanding another $130,000 in severance benefits from ExxonMobil on the basis of declining a relocation to Houston. While the Court refrains from determining the veracity of Giunta's allegations at this time, it

recognizes that Halliburton's personnel records, if deemed accurate, constitute damning evidence of Guinta's possibly ill-motivated intentions in bringing the present lawsuit.

all claims for benefits are paid from the general assets of ExxonMobil. Based on this solitary fact, Giunta concludes that the Plan Administrator did not act in Giunta's best interest. As this Court has previously recognized, the key inquiry in determining the existence of a conflict of interest is whether the same entity both "insures and administers the plan." *Id.* at 295. In this case, Defendant does not deny that the Plan is self-funded. However, even assuming that the same entity both insures and administers the Plan, this fact standing alone only slightly reduces the level of deference given to the Plan Administrator. *See id.* at 300 (holding that in such a situation, the plan administrator decision is reviewed "with only a modicum less deference."); *Dew v. Metropolitan Life Ins. Co.,* 69 F.Supp.2d 898, 902 (S.D.Tex.1999). Furthermore, the only additional purported evidence of conflict proffered by Giunta is Leis' failure to inform Giunta of his appeal rights within sixty days of receiving Giunta's claims.[6] Although the Court agrees that Leis failed to describe the exact appeal procedure in either of his two denial letters, there is no evidence that such omission was intentional, much less harmful to Giunta. Moreover, Leis' failure to notify Giunta of his appeal rights does not in any way indicate that Leis' ultimate decision to deny severance benefits was influenced by a conflict of interest. Consequently, in accordance with the Fifth Circuit's "sliding scale" approach, the Court reviews the Plan Administrator's decision under an abuse of discretion standard, giving due consideration to the modest possibility that the Plan Administrator may have acted under a conflict of interest.

### III.

■■■ Generally, application of the abuse of discretion standard is a two-step process. *See Wildbur,* 974 F.2d at 637. This procedure requires the Court first to determine the legally correct interpretation of the plan and then to examine whether the administrator applied the same. If the administrator failed to apply a legally correct interpretation of the plan, the Court then determines whether the administrator's actions constituted an abuse of discretion. *See id.* When determining the legally correct interpretation of the plan, the Court considers:

(1) whether the administrator has given the plan a uniform construction;

(2) whether the interpretation is consistent with a fair reading of the plan; and

(3) any unanticipated costs resulting from different interpretations of the plan.

*Id.* at 638 (citing *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.1990)).

If the administrator has applied a legally correct interpretation of the plan, then no further inquiry is required. *See, e.g., Chevron Chemical Co.,* 47 F.3d at 146; *Haubold v. Intermedics, Inc.,* 11 F.3d 1333, 1341 (5th Cir.1994). However, if the Court finds that the administrator's interpretation is legally incorrect, then it must

---

**6.** Section 2.12 of the Plan stipulates: "The Plan Administrator shall, within sixty (60) days after receipt of such written claim, send a written notification to the Eligible Employee as to its disposition. In the event the claim is wholly or partially denied, such written notification shall (a) state the specific reason or reasons for the denial, (b) make specific reference to pertinent Plan provisions on which the denial is based, (c) provide a description of any additional material or information necessary for the Eligible Employee to perfect the claim and an explanation of why such material or information is necessary, and (d) set forth the procedure by which the Eligible Employee may appeal the denial of his or her claim." In the case at hand, Leis' denial letters appear to have satisfied the first three components of Section 2.12, but failed to fulfill the fourth requirement of apprising Giunta of his appeal rights.

evaluate whether that interpretation constitutes an abuse of discretion. In conducting this analysis, the Court considers:

(1) the internal consistency of the plan under the administrator's interpretation;

(2) any relevant regulations formulated by the appropriate administrative agencies; and

(3) the factual background of the determination and any inferences of lack of good faith.

*Wildbur*, 974 F.2d at 638 (citing *Batchelor v. International Brotherhood of Elec. Workers Local 861 Pension and Retirement Fund*, 877 F.2d 441, 445–48 (5th Cir.1989)).

■■■■■ If a benefits denial is supported by substantial evidence and is not errone-

ous as a matter of law, it is not arbitrary nor capricious, and therefore is not an abuse of discretion.[7] *See Wildbur*, 974 F.2d at 637 n. 12. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir.1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citation omitted)).

■■■ In the instant case, the Parties dispute the legally correct interpretation of the Plan with respect to the phrase "written consent" as used in Section 1.12.[8] Specifically, Giunta alleges that he is entitled to severance benefits under the Plan be-

7. The abuse of discretion standard is the equivalent of the arbitrary or capricious standard. *See Wildbur*, 974 F.2d at 635 n. 7 (noting no substantive difference between "abuse of discretion" and "arbitrary and capricious" standards); *Salley*, 966 F.2d at 1014 ("In applying the abuse of discretion standard, we analyze whether the plan Administrator acted arbitrarily or capriciously.").

8. The Parties also disagree as to the legal correctness of two other grounds undergirding the Plan Administrator's decision—principally, that an employee's objective conduct can independently satisfy the "written consent" requirement of Section 1.12, and that an employee is required to continue in his employment until "released" by the company in order to qualify for severance benefits. Because the Court's decision is premised upon other grounds, it declines to engage in an in-depth analysis of these alternative bases for granting dispositive relief. However, and without conclusively adjudicating these issues, the Court notes its serious doubts as to the legal vitality of these grounds. First, Section 1.12, although representing an extra-ERISA contractual obligation, clearly requires "written consent" to the relocation. Therefore, under any rules of contract construction, Giunta's objective conduct, no matter how clearly revealing of his understanding and assent to a permanent relocation, would not satisfy Section 1.12's "written consent"

requirement. Although Defendant is understandably dismayed by Giunta's potentially disingenuous and even deceptive representations to date, Defendant has noticeably failed to plead waiver or estoppel in this case. As such, the Court is compelled to evaluate this case in the context of the plain language of the contract, without giving any independent regard to Giunta's objective conduct, no matter how egregious. Additionally, the Court is doubtful that Giunta is barred from receiving benefits on the basis of his failure to continue in his employment until "released" by the company. Although the Court realizes that this purported requirement is stated in the SPD, it is *not* also contained within the body of the actual Plan. It is well known that pursuant to ERISA's statutory mandates, plan administrators are required to provide plan participants with "an accurate, comprehensive, and easy to understand summary of the plan," also known as SPDs. *Fallo v. Piccadilly Cafeterias, Inc.*, 141 F.3d 580, 583 (5th Cir. 1998); *see also* 29 U.S.C. § 1022(a)(1). While the Fifth Circuit has held that the terms of the SPD are binding where a conflict exists between the SPD and the actual ERISA plan, the instant case does not present such a scenario. *See, e.g., Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 938–39 (5th Cir.1993); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981–82 (5th Cir.1991). Here, there is no conflict between the Plan and the SPD, since only the SPD dictates that an employee must continue in his employment until "released"

cause he was relocated to a facility more than fifty miles from his principal place of employment without his "written consent," thereby supplying a "good reason" for the voluntary termination of his employment. According to Giunta, "written consent" under Section 1.12 can only be satisfied when an employee signs the ExxonMobil ABCD Form. Because he never signed the ABCD Form during the five months that he worked in Houston, Giunta maintains that he never provided "written consent" to the relocation. In stark contrast, the Plan Administrator believes, and Defendant now argues, that "written consent" under Section 1.12 refers to *any* written consent, whether contained in the ABCD Form or any other written communication, wherein the eligible employee expresses his assent to the relocation. Viewed under this lens, the Plan Administrator contends that Giunta was not eligible for severance benefits because he provided "written consent" to the relocation by filling out and submitting the ExxonMobil Relocation Authorization Form, which indicated an effective transfer date of March 1, 2000, and tendering numerous Relocation Expense Reports, which sought reimbursement for lodging and transportation expenses affiliated with the relocation.

Applying the three relevant factors of uniform construction, fair reading, and unanticipated costs, the Court concludes that Defendant's interpretation of "written consent" is legally correct. First, with regard to uniformity of construction, there is no

evidence in the record that the Plan Administrator ever interpreted the phrase "written consent" to refer exclusively to the ABCD Form or any other type of written document. However, Giunta challenges the uniformity of the Plan Administrator's construction by raising two recent examples: Keith Carwile ("Carwile"), a former employee who received severance benefits under the Plan after being relocated to a facility more than fifty miles from his principal place of employment, and then declining relocation after working at the new facility for two months; and Stephen Pease ("Pease"), another former employee who was permitted to work at a new location more than fifty miles from his principal place of employment without waiving his entitlement to severance benefits. While the Court agrees that these examples may be illustrative of the fact that an employee's objective conduct cannot be construed as a per se acceptance of a relocation, they are not demonstrative of the very separate proposition that severance benefits can inure to an employee who *has* provided some form of written consent to a relocation. In the case of Carwile, for example, the employee was granted severance benefits after working at a new location for two months because he never provided any type of written consent to the relocation as required under Section 1.12. Thus, Carwile was allowed to decline the relocation pursuant to the ABCD Form, even though he had already commenced working at the new facility.[9]

by the company. Furthermore, this is not a case where an *employee* is attempting to assert a term that is contained in the SPD, but contradicted in the underlying plan, against an *employer*. In those types of cases, the Fifth Circuit has unequivocally held that "the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter." *See Hansen*, 940 F.2d at 981–82. In the case at hand, however, the *employer* is attempting to

assert a term that is contained solely in the SPD against the *employee*. Given these substantial factual distinctions, the Court is not convinced that the instant SPD provision requiring an employee to continue in his employment until released by ExxonMobil is enforceable against Giunta.

9. Another distinction drawn by Defendant is that Carwile questioned his supervisors about his eligibility for severance benefits immediately after he began working at the new facili-

In the case of Pease, the Plan Administrator concurred with the employee that "his reporting to work would not itself be deemed an acceptance of the job in Houston and therefore would not preclude his appeal if filed timely." However, on appeal, the Plan Administrator determined that Pease was not entitled to severance benefits because Pease had provided written consent to the transfer through an e-mail message indicating his acceptance of the relocation and setting out a schedule for his transfer. Importantly, the Plan Administrator in Pease, consistent with the interpretation presently offered by Defendant, stated in his opinion letter on appeal that "Mr. Pease did give his written consent to his transfer to Houston. The Plan does not require use of any specific form for this purpose, and the failure to provide an 'Assignment Decision Form' does not mean that there was no consent." Ironically, then, the example of Pease actually buttresses Defendant's construction of "written consent" as applying broadly to *any* form of written consent, not just the ABCD Form. Furthermore, neither the example of Carwile or Pease demonstrates that the Plan Administrator's interpretation of "written consent" is incongruous with any prior decisions. The Court therefore finds that the factor of uniformity of construction supports the Plan Administator's interpretation.

■ Next, the Court believes that the Plan Administrator's interpretation is consistent with a fair reading of the Plan. Initially, the Court observes that Section 1.12's "written consent" requirement appears to be an extra-ERISA contractual obligation that is rendered enforceable by contract law, rather than ERISA's statutory protections. *See, e.g., Spacek v. Maritime Ass'n,* 134 F.3d 283, 287 (5th Cir. 1998) (holding that "when an employer imposes upon itself extra-ERISA contractual obligations in its employee benefits plan, these extra-ERISA obligations are rendered enforceable by contract law"). In this case, Section 5.9 of the Plan specifically denotes that the Plan shall be construed and enforced according to the laws of the Commonwealth of Virginia, unless otherwise preempted by federal law. Whether analyzed under Virginia law or federal ERISA law, the result is identical. Under Virginia law, contract terms are to be given their usual, ordinary, and popular meaning. *See D.C. McClain, Inc. v. Arlington County,* 249 Va. 131, 452 S.E.2d 659, 662 (1995). Similarly, the Fifth Circuit has opined that ERISA provisions should be interpreted in an ordinary and popular sense as would a person of average intelligence and experience, or in the same manner as they are likely be understood by the average plan participant. *See Tucker v. Shreveport Transit Mgmt.,* 226 F.3d 394, 398 (5th Cir.2000). Ascribed its ordinary and popular meaning, and viewed from the perspective of the average plan participant, the phrase "written consent" is most reasonably construed as *any* written document or communication expressing the employee's assent to or approval of the relocation. Because the Plan itself does not explicitly define or otherwise indicate the appropriate meaning attaching to the phrase "written consent," much less infer that the phrase "written consent" contemplates the ABCD Form in particular, it would be highly unreasonable to assume that the term "written consent" refers exclusively to the ABCD Form. Instead, the

---

ty. During the two-month interim, Carwile continued working at the new facility while the Plan Administrator reviewed his eligibility for severance pay. In the instant case, however, Defendant challenges whether Giunta

ever asked his supervisors about his eligibility for severance benefits, or even requested to be transferred back to New Orleans, during his five-month stint in Houston.

only fair reading of the Plan would construe "written consent" as referring to exactly what it states—consent expressed in some form of writing.

Having stated that, however, the Court sympathizes with Giunta regarding the possibility that ExxonMobil violated its own internal policy of having all employees who accept or decline a position within two years following the merger to sign the ABCD Form. As both Parties acknowledge, the written consent requirement in Section 1.12 was crafted to ensure that employees were aware of the consequences of accepting or declining a position with the newly formed corporation. The ABCD Form, which clearly lays out the various consequences of accepting or declining a position, was ostensibly developed to facilitate this goal. The various e-mail communications between Leis and other staff members seem to indicate that ExxonMobil abided by a formal or informal policy of having employees sign the ABCD Form when accepting a position that would trigger benefits under the Plan if declined. Furthermore, it is clear from the record that Giunta's failure to sign the ABCD Form upon relocating to Houston was anomalous. The only other two employees who were allowed to relocate without signing the ABCD Form were Carwile and Pease, the former of whom eventually signed the ABCD Form, and the latter of whom provided written consent through an e-mail communication. In fact, Leis himself concedes in his second opinion letter that Giunta's failure to complete the ABCD Form "might indicate an inadvertent administrative error." Notwithstanding any administrative bungling that may be alleged to have led to the present lawsuit, however, the Court is confined solely to evaluating whether the Plan Administrator's interpretation of "written consent" is consistent with a *fair* reading of the Plan. Even assuming that Giunta was supposed to sign the ABCD Form pursuant to ExxonMobil's internal policy, this fact alone does not diminish the fairness or reasonableness of the Plan Administrator's interpretation. Giunta admits that employees were not privy to the internal policy, such that the average plan participant would not have associated the concept of "written consent" with the ABCD Form exclusively. Applying a plain and ordinary meaning to the phrase "written consent," and viewing Section 1.12 from the perspective of the average plan participant, the Court concludes that the Plan Administrator's interpretation is reasonably consistent with a fair reading of the Plan.

Finally, the Court considers whether any unanticipated costs would arise under competing interpretations of the Plan. Although the Parties do not provide substantial briefing on this issue, the Court surmises that neither interpretation is significantly likely to produce unanticipated costs. However, the Court admits that there exists some possibility, albeit slight, that Giunta's interpretation could result in unexpected costs to ExxonMobil, assuming that there are other employees in Giunta's identical situation who might seek to claim severance benefits under the Plan. Essentially, if the Court were to adopt Giunta's interpretation, then any ExxonMobil employee who consented to a relocation more than fifty miles from his principal place of employment through a written medium other than the ABCD Form will also be entitled to severance benefits under Section 1.12. However, because Giunta's case appears to be aberrant, given that the vast majority of other ExxonMobil employees appear to have signed the ABCD Form upon relocating, it is unlikely that any identical cases of this nature will arise in the future. As such, this third factor only minimally favors Defendant's interpretation of Section 1.12.

In light of the Plan Administrator's uniform construction of Section 1.12, as well as the interpretation's consistency with a fair reading of the Plan, and the possible unanticipated costs that may arise under a contrary interpretation, the Court concludes that the Plan Administrator's interpretation of the "written consent" provision in Section 1.12 is legally correct. Having made this determination, the Court is not obligated to conduct any further inquiry. *See, e.g., Chevron Chemical Co.,* 47 F.3d at 146; *Haubold v. Intermedics, Inc.,* 11 F.3d 1333, 1341 (5th Cir.1994).

■■■ However, even if the Court were to find that the Plan Administrator applied a legally incorrect interpretation of the Plan, it would still validate the Plan Administrator's ultimate decision to deny benefits to Giunta under the applicable abuse of discretion standard. In short, the Court finds that the summary judgment evidence clearly shows that the Plan Administrator did not abuse his discretion in determining that Giunta provided written consent to the relocation to Houston. According to his Affidavit, the Plan Administrator reviewed the Plan documents as well as the information propounded by Giunta on appeal, and twice determined that Giunta had provided written consent to the relocation by filling out and submitting the ExxonMobil Relocation Authorization Form and various Relocation Expense Reports. These documents, considered in conjunction with other external evidence indicating that Giunta knew the relocation to Houston to be permanent,[10] formed the reasonable basis for the Plan Administrator's decision. Although the Court realizes

that Giunta never actually signed the Relocation Authorization Form (given that the form did not contain a space for an employee signature), he did complete the relevant portions of the document in his own hand. Specifically, Giunta penned his name, social security number, spouse's name, address, and old and new phone numbers, and specifically wrote that his effective date of transfer would be on March 1, 2000. Furthermore, Giunta tendered numerous Relocation Expense Reports requesting reimbursement for expenses that were typically allocated only to ExxonMobil employees who were permanently relocating. Each of these documents was personally signed by Giunta, and each of these requests for reimbursement was fully honored by ExxonMobil. While it may have been ideal (in fact, for *all* Parties to this lawsuit) if Giunta had signed the ABCD Form prior to relocating to Houston, it certainly was not arbitrary and capricious for the Plan Administrator to decide that Giunta's authorship and submission of the ExxonMobil Relocation Authorization Form and various Relocation Expense Reports constituted "written consent" to the relocation under Section 1.12, such that Giunta did not have a "good reason" for terminating his employment, and was therefore ineligible to receive severance benefits. Although it might have been equally reasonable for the Plan Administrator to reach the opposite conclusion, this does not mean that the Plan Administrator abused his discretion. *See Vega,* 188 F.3d at 297 (noting that the reviewing court "need only assure that the administrator's decision fall[s] somewhere

---

**10.** While the Court disagrees with Defendant's theory that Giunta's objective conduct constituted an independent basis for denying severance benefits, it agrees that certain external evidence may have been relevant to the Plan Administrator's determination that Giunta was consenting to a relocation in filling out and submitting the Relocation Authorization

Form and various Relocation Expense Reports. Although Giunta alleges that he believed the relocation to Houston to be temporary, Defendant proffers significant evidence to the contrary, including the opinion of Tim Cutt, Giunta's direct supervisor, who avers that Giunta clearly knew that he was consenting to a permanent relocation to Houston.

on a continuum of reasonableness—even if on the low end"); *Woolsey v. Marion Labs., Inc.,* 934 F.2d 1452, 1460 (10th Cir. 1991) (observing that when reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious"). Rather, and quite to the contrary, the evidence in this case overwhelmingly demonstrates that the Plan Administrator acted reasonably and properly in denying Giunta's claim for benefits. In light of the stringent legal standard under which this Court must review the Plan Administrator's decision, the Court determines that the Plan Administrator applied a legally correct interpretation of the Plan, and did not abuse his discretion in denying severance benefits to Giunta as a matter of law.

## IV.

For all of the foregoing reasons, the Court concludes that Plaintiff has failed to raise a genuine issue of material fact for trial. The Court accordingly hereby **GRANTS** Defendant's Motion for Summary Judgment, and hereby **DENIES** Plaintiff's Motion for Summary Judgment. Because Plaintiff's claims fail as a matter of law, the Court hereby **DISMISSES WITH PREJUDICE** Plaintiff's claims against Defendant in their entirety. Each Party is to bear its own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**